UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>SKS Bottle and Packaging, Inc.,<br><br>Debtor. | Chapter 11<br>Case No. 24-11283 |

**MOTION FOR ENTRY OF ORDERS: (A)(I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (II) SCHEDULING AN AUCTION AND HEARING TO CONSIDER AND APPROVE THE SALE, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (IV) APPROVING THE STALKING HORSE APA; (B)(I) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (II) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

SKS Bottle and Packaging, Inc., the above-captioned debtor and debtor in possession ("**SKS**" or, the "**Debtor**") by and through its undersigned counsel, hereby submits this motion (the "**Motion**"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq*., the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 6004-1 and 6004-2 of the Local Bankruptcy Rules for the Northern District of New York (the "**Local Rules**"), for entry of orders: (a)(i) approving bidding procedures in connection with the sale of substantially all of the Debtor's assets (the "**Acquired Assets**"), (ii) scheduling an auction and a hearing to consider and approve the sale, (iii) approving the form and manner of notice thereof, and (iv) approving the terms of the Asset Purchase Agreement by and between Pipeline Packaging Corporation ("**Pipeline**" or the "**Stalking Horse Purchaser**") and SKS Bottle And Packaging, Inc. (the "**Stalking Horse APA**"); (b)(i) authorizing and approving the sale of the Acquired Assets free and clear of liens, claims, encumbrances and interests, and (ii) authorizing and approving the assumption and

1

assignment of executory contracts and unexpired leases; and (c) granting related relief. In support of this Motion, the Debtor respectfully represents as follows:

**JURISDICTION**

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.     The statutory and rule-based predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 and Local Rules 6004-1 and 6004-2.

**BANKRUPTCY CASE BACKGROUND**

5.     On November 18, 2024 (the "**Filing Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of New York, commencing the Debtor's chapter 11 case (this "**Chapter 11 Case**"). The Debtor continues to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for a trustee or examiner has been made in this Chapter 11 Case and, as of the date of the filing of this Motion, no official committee of unsecured creditors has been appointed.

6.     The Debtor is a container and packaging supplier, consultant, and designer, specializing in plastic bottles, glass bottles, plastic jars, glass jars, metal containers, and closures. The Debtor's business experienced significant and rapid growth through 2019, operating out of state-of-the-art facilities in Saratoga Springs, New York and Reno, Nevada.  As of 2019, annual revenues totaled $44.79 million.  The supply chain disruptions following the COVID-19 pandemic severely constrained the Debtor's inventory availability, resulting in progressive reductions in sales

2

and revenue.   Revenue had fallen to $17.1 million in 2022, $ 10.33 million in 2023, and is expected

to have fallen to $5.6 million in 2024.

7.      In order to help alleviate financial pressures, in 2023, the Debtor completed a sale-

leaseback transaction with Green Mountain Electric Supply, Inc. ("**GMES**") whereby GMES

purchased and leased the Saratoga facility back to SKS.  The sale proceeds were used to pay off

SKS's existing mortgage loan on the facility, funded future rents to GMES, and provided SKS with

working capital.  Unfortunately, the proceeds of the sale-leaseback were not adequate to allow SKS

to reverse its downward trend.

8.      On or about June 24, 2024, GMES made a $842,000 loan to the Debtor, $44,205.00

of which was held by GMES to fund an interest reserve to cover loan interest through December 31,

2024 (the "Loan").  The Loan is secured by a perfected first position security interest on all of the

Debtor's business assets, including accounts, equipment, fixtures, inventory and the proceeds and

replacements thereof.   As of the Filing Date, the outstanding principal balance of the Loan is

$842,000.00

9.      The Debtor's filing was precipitated by, among other things, the commencement of

eviction proceeding by GMES to dispossess the Debtor of possession of its principal place of

business.  The Declaration of Kendall Horan filed pursuant to Local Bankruptcy Rule 2015-2

contains more information regarding the Debtor's history, business operations, and the events

leading up to the Filing Date.

## THE STALKING HORSE APA

10.      As the Debtor's business struggled financially leading up to the Filing Date, the

Debtor was actively trying to find a purchaser or strategic equity partner to provide a substantial

infusion of capital needed to turnaround the Debtor's business.  Although the Debtor was not able

to find an equity partner, the Debtor was in discussions with multiple prospective purchasers as of the Filing Date.  Since the Debtor was facing the expiration of its lease with GMES for its principal place of business, the Debtor diligently continued to explore all of its options post-petition with the goal of securing a sale that would pay all secured and admin claims, as well as result in a meaningful distribution to unsecured creditors.

11.     In December, several prospective purchasers made one or more site visits and were actively negotiating terms to purchase the Debtor.  In December 2024, Pipeline emerged as the most viable purchaser and the parties entered into a Letter of Intent on or about January 9, 2025.  The Letter of Intent was subsequently amended and extended on or about January 24, 2025. Subsequently, the parties executed the Stalking Horse APA on February 19, 2025.  A copy of the executed Stalking Horse APA is attached as **Exhibit A**.  The Stalking Horse APA provides that the Stalking Horse Purchaser will purchase all or substantially all of the Debtor's assets in exchange for a cash purchase price of $1,500,000.00 (the "Purchase Price").[3] A summary of certain material terms of the Stalking Horse APA is provided below:

i.     Assets to be sold: substantially all of the Debtor's assets, other than the Excluded Assets. Section 2.1 of the Stalking Horse APA contains a more detailed list of the Acquired Assets being sold by the Debtor.

ii.     Excluded Assets include:

    a.  All cash (including, without limitation, checking account balances, certificates of deposit and other time deposits and petty cash) net of overdrafts ("***Cash***") and marketable and other securities;

    b.  Any and all rights under this Stalking Horse APA, including without limitation all rights to the Purchase Price and avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law, including, without limitation, all rights and avoidance claims of Seller arising under Chapter 5 of the Bankruptcy Code (an "***Avoidance Action***" and collectively the "***Avoidance Actions***");

    c.  All Contracts other than the Assumed Executory Contracts (the "***Excluded Contracts***") and all Permits that are not assignable under applicable law;

    d.  Tax Returns of Seller and related materials to the extent related to such Tax Returns;

4

    e.    The equity securities or other ownership interest of Seller or any of Seller's Affiliates; and

    f.    All losses, loss carryforwards and rights to receive refunds, credits and loss carry forwards with respect to any and all Taxes of Seller.

  iii.  <u>Assumed Obligations include</u>:

    a.    The obligations under the Assumed Executory Contracts first arising after the Closing. The Assumed Executory Contracts are set forth on Schedule 2.1(a)(iv) to the Stalking Horse APA.

  iv.  <u>Consideration</u>: the aggregate purchase price for the Acquired Assets is $1,500,000.

    10.    Pursuant to the Stalking Horse APA, an auction for the sale of the Acquired Assets will be conducted by Seller if, and only if, any Qualified Bid (other than this Stalking Horse APA) is received pursuant to the terms and conditions of the Bidding Procedures Order.  In the event that an auction is held, the Debtor has agreed to grant the Stalking Horse Purchaser certain bidding protections, including a stalking horse reimbursement of up to $50,000.00 and a break-up fee equal to five (5%) percent of the Purchase Price (collectively, the "Bid Protection Amount").  If no other Qualified Bid is received, the Debtor will ask the Court to approve the sale of the Acquired Assets to the Stalking Horse Purchaser pursuant to the terms of the Stalking Horse APA.

    11.    The sale of the Acquired Assets must occur on an expedited schedule. The Debtor's lease expired on December 31, 2024. Since that time GMES has temporarily agreed not to pursue eviction proceedings.  Pursuant to the Final Order authorizing the Debtor's use of cash collateral, GMES was granted an administrative expense claim for unpaid post-petition rent during a portion of November 2024 through January 2025 in the amount of $244,569.94, and a post-petition lien on all of the Debtor's assets for the portion of such amount representing the January 2025 rent ($100,507.94). GMES is also entitled to an administrative rent claim for February 2025 and March 2025 (or so much thereof as is allocable to the period during the Debtor's continued occupancy), at the rate of $100,507.94 per month.  The foregoing rental amounts are referred to herein collective as the "GMES Administrative Claim").

12.    Moreover, the Debtor projects that it will soon be unable to make payroll.  For these reasons, the Debtor believes that an expedited sale is critical to maximizing value for the estate and to ensure a successful result in this Chapter 11 Case.

## BRIEF STATEMENT PURSUANT TO LOCAL RULE 6004-1

13.    Pursuant to the requirements of Local Rule 6004-1, the Debtor states as follows:

(a)    The Acquired Assets to be offered for sale include substantially all assets of the Debtor.

(b)    The Stalking Horse Purchaser is Pipeline Packaging Corporation, a corporation organized under the laws of Ohio, or its designee.

(c)    The total consideration proposed to be given for the Acquired Assets under the Stalking Horse APA is $1,500,000.00.

(d)    While the Debtor did not retain a broker or sales consultant, the Debtor aggressively sought out prospective purchasers for months prior to executing the Stalking Horse APA.

(e)    Parties who are known to the Debtor to assert a lien on some or all of the Acquired Assets, and the approximate amounts (if known) of such asserted liens, are set forth in the following table:

| Claimant | Amount |
|---|---|
| GMES | $842,000.00 |

(f)    Subject to approval by the Court, the Bid Protection Amount (if payable), and the proposed sale of the Acquired Assets, will be free and clear of liens, claims, encumbrances and interests, except for such liens, claims, encumbrances and interests to be assumed by the Stalking Horse Purchaser pursuant to the Stalking Horse APA.

(g)    The proceeds of the proposed sale are not subject to any exemption in favor of the Debtor.

(h)    The proposed sale will benefit the Debtor's estate by providing approximately $1,500,000.00 of value in the form of cash.

(i)    That the sale of the Acquired Assets is subject to higher or better offers as determined in accordance with the proposed Bidding Procedures.

(j)    The Debtor anticipates that any closing costs incurred in connection with the proposed sale will be usual and customary for transactions of this type. Any attorney or other professional fees incurred by the Debtor in connection with the sale are

subject to approval by the Bankruptcy Court following notice and a hearing pursuant
to section 330 of the Bankruptcy Code.

## SUMMARY OF RELIEF REQUESTED

15.     The Debtor seeks, pursuant to sections 105, 363, 365, 503 and 507 of the
Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, and Local Rules 6004-1
and 6004-2, the Court's approval of: (a) the sale of the Acquired Assets free and clear of all liens,
claims, encumbrances and interests; (b) the institution of certain bidding, auction and notice
procedures for the solicitation and consideration of competing offers for the Acquired Assets
(collectively, the "Bidding Procedures," annexed as Schedule 1 to the Bidding Procedures Order
(as defined below)); (c) the terms of the Stalking Horse APA and the proposed payment of Bid
Protection Amount from the sale proceeds free and clear of all liens, claims, encumbrances and
interests in the event the Acquired Assets are sold to a party other than the Stalking Horse
Purchaser; and (d) the assumption, assignment and/or transfer of certain executory contracts and
unexpired leases to the Successful Bidder(s) (as defined in the Bidding Procedures).

16.     More specifically, through this Motion, the Debtor requests that the Court enter the
following orders:

(a)     The Bidding Procedures Order: An order in substantially the form attached hereto as
***Exhibit B*** (the "**Bidding Procedures Order**"): (i) approving the Bidding Procedures;
(ii) establishing the dates and times for the deadline to bid on the Acquired Assets
(the "**Bid Deadline**"), the auction for the Acquired Assets (the "**Auction**") and the
hearing to consider approval of the sale of the Acquired Assets (the "**Sale Hearing**")
pursuant to the dates proposed in the Bidding Procedures Order and subject to the
Court's availability; (iii) approving the notice (the "**Notice of Auction and Sale
Hearing**") of the same; (iv) approving the notice (the "**Notice of Assumption and
Assignment**") of the Debtor's intent to assume, assign and/or transfer to the
Successful Bidder(s) or Back-Up Bidder(s), certain contracts, commitments, leases,
licenses, permits, purchase orders, and any other executory contracts and unexpired
leases (each, an "Executory Contract" or "Unexpired Lease" and collectively, the
"Executory Contracts and Unexpired Leases"), and the corresponding cure amounts
(if any) required to be paid in connection with such assumption, assignment and/or
transfer; and (v) approving the terms of the Stalking Horse APA and authorizing the
Debtor to pay the Bid Protection Amount from the sale proceeds free and clear of all

7

liens, claims, encumbrances and interests in the event the Acquired Assets are sold to a party other than the Stalking Horse Purchaser.

(b)     The Sale Order: Following the Sale Hearing, one or more orders (each, a "Sale Order"): (i) approving the sale of the Acquired Assets free and clear of Interests and (ii) approving the assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases to the Successful Bidder(s) or Back-Up Bidder(s) as determined pursuant to the Bidding Procedures.

17.     The Debtor expressly reserves the right to modify the relief requested in this Motion, including the proposed Bidding Procedures and to propose an appropriate form of Sale Order, prior to or at the applicable hearing.

## BIDDING PROCEDURES AND RELEVANT NOTICES

### A.    Bidding Procedures

18.     The Debtor believes the proposed Bidding Procedures, which are annexed as Schedule 1 to the Bidding Procedures Order and as Exhibit 1 to the Stalking Horse APA, will maximize the realizable value of the Acquired Assets for the benefit of the Debtor's estate, creditors and other interested parties. The Bidding Procedures contemplate a process pursuant to which the Stalking Horse APA will be subject to higher or otherwise better offers.  While the Bidding Procedures afford the Stalking Horse Purchaser some measure of protection for its "stalking horse" bid by virtue of the Bid Protection Amount, they primarily benefit the Debtor by creating a bidding process that ensures, among other things: (i) structure and certainty to the process; (ii) the Debtor's ability to compare the relative values of competing offers, if any; (iii) that any potential alternate buyer has the financial wherewithal to timely consummate its purchase; and (iv) meaningful bidding increments.

19.     The Debtor seeks to implement a competitive bidding process designed to maximize recovery for the benefit of its estate.  As described below and more fully in the Bidding Procedures, an Auction will be held only if the Debtor receives a Qualified Bid.  If the Debtor receives a Qualified Bid and an Auction is held, only Qualified Bidders who timely submit

Qualified Bids will be eligible to participate in the Auction.  Specifically, the Bidding Procedures provide, in relevant part, as follows:

(a)          Participation Requirements: In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in the Acquired Assets (a "Bidder") must first deliver the following materials to the Debtor and its counsel:

      i.      an executed confidentiality agreement in form and substance satisfactory to the Debtor and its counsel; and

      ii.     the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Bidder, or, if the Bidder is an entity formed for the purpose of a sale transaction, (x) Financials of the equity holder(s) of the Bidder and (y) a written commitment acceptable to the Debtor of the equity holder(s) of the Bidder to be responsible for the Bidder's obligations in connection with a sale transaction (including being bound by the terms and conditions of the Bidding Procedures); which demonstrate to the Debtor's reasonable satisfaction the Bidder's financial ability to consummate a competing sale transaction, provided that if a Bidder is unable to provide Financials, the Debtor may in its discretion, but shall have no obligation to, accept such other information as the Debtor deems sufficient to establish a Bidder's financial wherewithal.

A Bidder meeting the requirements set forth in this paragraph shall be considered a "Qualified Bidder." Notwithstanding the foregoing, the Stalking Horse Purchaser shall be a Qualified Bidder.

(b)          Qualified Bid. The Debtor shall determine whether a bid qualifies as a "Qualified Bid." To constitute a Qualified Bid, a bid (other than the Stalking Horse APA, which shall constitute a Qualified Bid) must be a written irrevocable offer from a Qualified Bidder and meet the following conditions, unless waived by the Debtor:

      i.      contain a proposed asset purchase agreement, executed by and binding upon the Bidder, reflecting the terms and conditions of the bid (each, a "Proposed Asset Purchase Agreement"). Such Proposed Asset Purchase Agreement should also:

            a.  contain terms that are substantially similar to, and not materially more burdensome or conditional than, the terms of the Stalking Horse APA (unless the Debtor determines any proposed alternative terms are superior to the terms and conditions of the Stalking Horse APA), and such Bidder must also include a marked copy of its Proposed Asset Purchase Agreement showing any changes, amendments or modifications to the Stalking Horse APA that are being proposed by the Bidder, as applicable (each, a "Marked Asset Purchase Agreement"); and

       b.   provide that the consideration to be given for the Acquired Assets will exceed the Purchase Price (as defined in the Stalking Horse APA), by at least $175,000.00 (the "Initial Minimum Overbid") which amount is the sum of (i) $125,000.00 (the expected value of the Bid Protection Amount), and (ii) the minimum bid increment of $50,000.00;

ii.    contain a list of the Debtor's executory contracts and unexpired leases (if any) with respect to which the Bidder seeks assignment from the Debtor, provided, however, if any bid is conditioned on the assumption and assignment of executory contracts and/or unexpired leases, the Bidder shall be required to provide evidence of its ability to provide adequate assurance of future performance of such contracts or leases along with its bid;

iii.   confirm that the Bidder's offer shall remain open and irrevocable as provided below;

iv.   be submitted no later than the Bid Deadline (defined below) and accompanied by a certified or bank check or wire transfer in an amount equal to ten percent (10%) of the proposed purchase price set forth in the Proposed Asset Purchase Agreement as a minimum good faith deposit (the "Deposit"), which Deposit shall be used to fund a portion of the purchase price provided for in the bid;

v.    not be conditioned on obtaining financing or the outcome of any due diligence by the Bidder;

vi.   not request or entitle the Bidder to any break-up fee, expense reimbursement or similar type of payment; and

vii.  fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

(c)    Bid Deadline and Submission: Bids must be received no later than **12:00 noon (prevailing Eastern time) on March 5, 2025** (the "Bid Deadline") by: (a) counsel to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.; (b) counsel to GMES, Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich, Esq. and Brian Roy, Esq.; (c) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; and (d) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114, Attn:  John Paul Lucci, Esq. (jlucci@hahnlaw.com).  As promptly as practicable after a Bidder delivers a bid, the Debtor shall determine, and shall notify the Bidder, whether the Bidder is a Qualified Bidder and whether its bid is a Qualified Bid. The Debtor may modify, employ and announce at the Auction additional or amended procedural rules that are reasonable under the circumstances for conducting the Auction, provided that

such rules (i) are not materially inconsistent with the Bidding Procedures Order and (ii) are disclosed to each Qualified Bidder attending the Auction.

(d)    <u>Auction</u>. If the Debtor receives two or more competing Qualified Bids for any of the Acquired Assets prior to the Bid Deadline, an auction (the "<u>Auction</u>") for such assets, as applicable, shall take place at **10:00 a.m. (prevailing Eastern time) on March 10, 2025** at the offices of Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, or at such other place and time as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids. If, however, no such competing Qualified Bids are received by the Bid Deadline, then the Auction will not be held, the Stalking Horse Purchaser shall be deemed the Successful Bidder.

(e)    <u>Auction Rules</u>.

i.    Only Qualified Bidders who have submitted a Qualified Bid and their authorized representatives will be eligible to attend and participate in the Auction. Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

ii.    The Debtor may, in its sole discretion, adopt rules for the Auction at any time that the Debtor reasonably determines to be appropriate to promote a value-maximizing auction, including, without limitation, conducting one of more sub-auctions for the Acquired Assets in different subsets or lots.

iii.    At the commencement of the Auction the Debtor shall announce the Qualified Bid that it has determined represents the highest or otherwise best bid for the Acquired Assets (the "Starting Qualified Bid"), the overall consideration value ascribed to such bid (the "Bid Value") and any other distinguishing features which, in the opinion of the Debtor, makes the Starting Qualified Bid the highest or otherwise best offer for the Acquired Assets.

iv.    Each Qualified Bidder present at the Auction will be permitted to increase its Qualified Bid (such increased Qualified Bid, a "Qualified Overbid"), provided that such Qualified Overbid(s) must exceed the Bid Value of the Starting Qualified Bid or, if applicable, the highest or otherwise best Qualified Overbid, by an incremental amount that is not less than an amount to be announced at or before the commencement of any Auction (the "Bidding Increment"). The Debtor reserves the right to determine an appropriate Bidding Increment for each subset or lot of Acquired Assets at the Auction. Notwithstanding the foregoing, the initial Bidding Increment for any Qualified Bids shall be $50,000.00, however the Debtor, in its business judgment, may select a different Bidding Increment for the Acquired Assets during the Auction. During the course of the Auction, the Debtor will inform the participants which Qualified Overbid reflects the then-highest or otherwise best offer for the applicable Acquired Assets and the Bid Value ascribed thereto. The Debtor shall not consider any subsequent bid received at the Auction unless the Bid Value of such bid, as determined

11

by the Debtor, exceeds the Bid Value of the Starting Qualified Bid or the then-highest Qualified Overbid by at least the applicable Bidding Increment.

v.   The Auction may be adjourned as the Debtor deems appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all Qualified Bidders that have submitted a Qualified Bid.

vi.   At the conclusion of the Auction, the Debtor shall announce the bid or combination of bids made pursuant to the Bidding Procedures that represents, in the Debtor's judgment, the highest or otherwise best offer for the Acquired Assets (each, a "Successful Bid") and the Bidder or Bidders submitting such bid or bids (the "Successful Bidder(s)"). The Debtor may also, in its discretion, announce the next-highest or otherwise best offer or offers for any subset of the Acquired Assets (each, a "Back-Up Bid") and the party or parties submitting such bid or bids (the "Back-Up Bidder(s)"). If an Auction is held, the Debtor shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared a Successful Bid (or a Back-Up Bid) at the Auction, (ii) definitive documentation has been executed in respect thereof, and (iii) the Court has approved the sale to a Successful Bidder (or Back-Up Bidder). Any acceptance by the Debtor is conditioned upon approval by the Court of the Successful Bid(s) (or Back-Up Bid(s)) and the entry of an order approving such Successful Bid(s) (or Back-Up Bid(s)).

(f)   Other Terms. All Qualified Bids, the Auction, and the Bidding Procedures are subject to such additional terms and conditions as may be announced by the Debtor from time to time, provided that such additional terms and conditions are not inconsistent with the Bidding Procedures Order.

(g)   Irrevocability of Certain Bids. Any Successful Bid(s) shall remain irrevocable in accordance with the terms of the Proposed Asset Purchase Agreement submitted by the Successful Bidder(s), as the same may be modified at the Auction. Back-Up Bid(s), as modified at the Auction, shall be irrevocable until the earliest of: (i) 45 days after entry of the Sale Order approving a Successful Bid for the same Acquired Assets; (ii) closing of the sale of the same Acquired Assets to the Successful Bidder; and (iii) such date as the Debtor affirms in writing that the Debtor does not intend to proceed with a sale to the Back-Up Bidder (the "Outside Back-Up Date"). Following the entry of the Sale Order, if a Successful Bidder fails to consummate the purchase of the Acquired Assets subject to its Successful Bid because of a breach or failure to perform on the part of the Successful Bidder, the applicable Back-Up Bid (if any) will be deemed to be the new Successful Bid, and the Debtor will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtor and the Debtor shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder. For the avoidance of doubt, if the defaulting Successful Bidder is the Stalking Horse Purchaser, the Stalking Horse Purchaser shall not be entitled to the Bid Protection Amount.

(h)     <u>Sale Hearing</u>. The Court shall conduct the Sale Hearing on **March 12, 2025 at 10:30 a.m. (prevailing Eastern time)**.

(i)      <u>Return of Deposit</u>. Except as otherwise provided in this paragraph with respect to any Successful Bid and any Back-Up Bid, the Deposits of all Qualified Bidders that submitted such a deposit under the Bidding Procedures shall be returned upon or within three (3) business days after the date on which the Court enters an order approving the sale of the Acquired Assets to the Successful Bidder(s) or otherwise concludes the Sale Hearing without adjournment. The Deposit of the Successful Bidder(s) shall be held until the closing of the sale of the Acquired Assets and applied in accordance with the Successful Bid(s) or returned in accordance with the Successful Bidder's purchase agreement. The Deposit of the Back-Up Bidder(s) shall be returned upon or within five business (5) days after the Outside Back-Up Date.

(j)      <u>Failure to Close</u>. If a Successful Bidder fails to consummate the transaction in accordance with the terms of the purchase agreement executed by the Successful Bidder by the closing date contemplated in the purchase agreement agreed to by the parties for any reason (except in the case of the Stalking Horse Purchaser, in which case the termination provisions in the Stalking Horse APA shall apply to the extent applicable), the Debtor shall: (i) retain the Successful Bidder's Deposit; (ii) maintain the right to pursue all available remedies, whether legal or equitable; and (iii) be free to consummate the proposed transaction with the applicable Back-Up Bidder at the highest price bid by the Back-Up Bidder at the Auction, without the need for an additional hearing or order of the Court.

(k)     <u>Reservation of Rights</u>. Except as otherwise provided in the Bidding Procedures Order, the Debtor reserves the right to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or best proposal; (iv) reject any bid that the Debtor deems to be (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtor and its estate; (v) remove some of the Acquired Assets from the Auction or offer the Acquired Assets in different subsets or lots; (vi) waive terms and conditions set forth herein with respect to all Bidders; (vii) impose additional terms and conditions with respect to all Bidders; (viii) extend the deadlines set forth herein; (ix) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (x) modify the Bidding Procedures, as the Debtor may determine to be in the best interests of its estate, or to withdraw the Motion and abandon the sale process at any time with or without prejudice.

(l)      <u>Expenses</u>. Except to the extent the Stalking Horse Purchaser is entitled to a Bid Protection Amount as set forth in the Stalking Horse APA, any Bidders presenting bids shall bear their own expenses in connection with the proposed sale of the Acquired Assets, whether or not such sale is ultimately approved.

20.    The Debtor believes that the Bidding Procedures are fair and reasonable, are designed to maximize the sale value of the Purchase Assets, and are not likely to dissuade any serious potential bidder from participating in the Auction process.

21.    The Debtor requests that the Court schedule the Sale Hearing on or prior to March 12, 2025. The Debtor further requests that the objection deadline, with respect to the sale of the Acquired Assets, be at least seven (7) days prior to such hearing.

**B.    Notice of Auction and Sale Hearing**

22.    The Debtor proposes that, on or before three (3) business days after entry of the Bidding Procedures Order, or as soon thereafter as such parties can be identified, the Debtor will cause: (a) a notice in substantially the form annexed as Schedule 2 to the Bidding Procedures Order (the "Notice of Auction and Sale Hearing"); and (b) a copy of the Bidding Procedures Order to be sent by first-class mail postage prepaid, to the following: (i) counsel to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.; (ii) counsel to GMES, Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich, Esq. and Brian Roy, Esq.; (iii) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; and (iv) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114, Attn: John Paul Lucci, Esq. (jlucci@hahnlaw.com); (v) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (vi) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, right of first refusal, or other Interest in or upon any of the Acquired Assets; (vii) the non-debtor parties to the Debtor's known Executory Contracts and Unexpired Leases and any parties who are known to claim interests

14

therein; and (viii) all persons known or reasonably believed to have expressed an interest in acquiring some or all of the Acquired Assets within the last six months.

23.     In addition to the foregoing, (a) electronic notification of this Motion, the Bidding Procedures Order and the Notice of Auction and Sale Hearing will be posted on the Court's electronic case filing (ECF) website, https://ecf.nynb.uscourts.gov; and (b) on or before three (3) business days after entry of the Bidding Procedures Order, the Debtor will serve the Notice of Auction and Sale Hearing on all known creditors of the Debtor and all other parties in interest entitled to receive notice pursuant to Bankruptcy Rule 2002(a)(2).

**C.     Notice of Assumption and Assignment
       of Executory Contracts and Unexpired Leases**

24.     To facilitate the sale of the Acquired Assets and the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases, the Debtor proposes to serve a notice of potential assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases in substantially the form annexed as Schedule 3 to the Bidding Procedures Order (the "Notice of Assumption and Assignment") on all non-debtor parties to the Debtor's known Executory Contracts and Unexpired Leases, on or before five (5) business days after the entry of the Bidding Procedures Order by first class mail or hand delivery. If the Debtor identifies additional executory contracts or unexpired leases that might be assumed by the Debtor and assigned to the Successful Bidder which are not set forth in the original Notice of Assumption and Assignment, the Debtor will promptly send a supplemental notice (a "Supplemental Notice of Assumption and Assignment") to the applicable counterparties to such additional executory contracts and unexpired leases.

25.     In the Notice of Assumption and Assignment, the Debtor will identify the calculation of the cure amounts (if any) that the Debtor believes must be paid to cure all defaults under the Executory Contracts and Unexpired Leases (the "Cure Amounts"). If no amount is listed

on the Notice of Assumption and Assignment with respect to an Executory Contract or Unexpired Lease, the Debtor believes that there is no Cure Amount applicable to such Executory Contract or Unexpired Lease. The Debtor requests that the Bidding Procedures Order provide that, unless a non-debtor party to an Executory Contract or Unexpired Lease files an objection (the "Cure Amount/Assignment Objection") to (a) their scheduled Cure Amount and/or (b) to the proposed assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease by the later of (i) 4:00 p.m. (prevailing Eastern time) on the date that is five (5) business days prior to the Bid Deadline or, (ii) solely with respect to any Executory Contract or Unexpired Lease which is the subject of a Supplemental Notice of Assumption and Assignment, five (5) days after service of the relevant Supplemental Notice of Assumption and Assignment (such later date, the "Cure/Assignment Objection Deadline") and serves a copy of the Cure Amount/Assignment Objection so as to be received no later than the Cure/Assignment Objection Deadline by: (i) counsel to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.; (ii) counsel to GMES, Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich, Esq. and Brian Roy, Esq.; (iii) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; and (iv) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114, Attn: John Paul Lucci, Esq. (jlucci@hahnlaw.com), then (A) such non-debtor party shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract or Unexpired Lease and the Debtor shall be entitled to rely solely upon the Cure Amount, and (B) if the Executory Contract or Unexpired Lease is identified as a Purchased Asset to be acquired by a Successful Bidder and/or Back-Up Bidder, the non-debtor party shall be deemed to have consented to the assumption,

assignment and/or transfer of such Executory Contract or Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtor, the Successful Bidder and/or Back-Up Bidder or any other assignee of the relevant Executory Contract or Unexpired Lease that any additional amounts are due or defaults exist, or that conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract or Unexpired Lease. Notwithstanding the foregoing, as provided below, each non-debtor party shall retain the right to object to the assumption, assignment or transfer of its Executory Contract or Unexpired Lease, based solely on the issue of whether the Successful Bidder and/or Back-Up Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

26.    The Debtor further requests that the Bidding Procedures Order provide that, if an objection challenges a Cure Amount, the objection must set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof. Upon receipt of a Cure Amount/Assignment Objection, the Debtor requests that it be granted the authority, but not direction, to resolve any Cure Amount/Assignment Objection by mutual agreement with the objecting counterparty to any Executory Contract or Unexpired Lease and the Successful Bidder or Backup Bidder without further order of the Court. In the event that the Debtor and any objecting party are unable to consensually resolve any Cure Amount/Assignment Objection prior to the Sale Hearing, the Debtor requests that the Court resolve such Cure Amount/Assignment Objection at the Sale Hearing.

27.    The Debtor requests that it, the Successful Bidder or the Back-Up Bidder, as the case may be, be authorized, subject to the terms of the Successful Bid or the Back-Up Bid, to exclude any Executory Contract or Unexpired Lease from the list of Acquired Assets to be sold (i) no later than the closing of the sale of the Acquired Assets, or (ii) if the Court determines at any hearing on a Cure Amount/Assignment Objection that the applicable cure amount for such contract is greater

17

than the Cure Amount proposed by the Debtor, no later than five (5) business days following the date of such determination. The non-debtor party or parties to any such excluded contract or lease will be notified of such exclusion by written notice mailed within two (2) business days of such determination.

28.     As soon as practicable after the conclusion of the Auction for the Acquired Assets, the Debtor proposes to serve a notice identifying the Successful Bidder(s) and Back-Up Bidder(s) to the non-debtor parties to the Executory Contracts and Unexpired Leases that have been identified for assumption and assignment in the Successful Bid(s) and Back-Up Bid(s). The Debtor proposes that the non-debtor parties to the Executory Contracts and Unexpired Leases should have until shall have until 10:00 a.m. on the day of the Sale Hearing (the "Adequate Assurance Objection Deadline") to object to the assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease solely on the issue of whether any Successful Bidder or Back-Up Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

## AUTHORITY FOR REQUESTED RELIEF

**A.     The sale of the Acquired Assets is within the sound
business judgment of the Debtor and should be approved**

29.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in the Second Circuit and elsewhere have held that approval of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code is appropriate where the proposed transaction represents a reasonable exercise of the debtor's business judgment.  *See e.g., In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d

Cir. 1983); *In re General Motors Corp.*, 407 B.R. 463, 491 (Bankr. S.D.N.Y 2009) ("[I]t is now well

established that a chapter 11 debtor may sell all or substantially all of its assets pursuant to section

363(b) prior to the confirmation of a chapter 11 plan, when the court finds a good business reason

for doing so."); *Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res.,*

*Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993), quoting *Van*

*Gorkom,* 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in

making a business decision the directors of a corporation acted on an informed basis, in good faith

and in the honest belief that the action was in the best interest of the company'," which has continued

applicability in bankruptcy); *see also In re Champion Motor Group, Inc.*, No 09-71979 (AST)

(Bankr. E.D.N.Y. Jan. 25, 2010); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y.

1989); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward*

*Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re*

*Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. D.C. 1991).

30.     Courts generally show great deference to a debtor in possession's decisions when

applying the business judgment standard. *See In re Global Crossing, Ltd.,* 295 B.R. 726, 744 n.58

(Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court

to substitute its own business judgment for that of the [d]ebtors and their advisors, so long as they

have satisfied the requirements articulated in the caselaw."). Deference is inappropriate only if such

business judgment is "so manifestly unreasonable that it could not be based on sound business

judgment, but only on bad faith, or whim or caprice." *Lubrizol Enterprises, Inc. v. Richmond Metal*

*Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1047 (4th Cir. 1985). *See also,*

*In re Integrated Res., Inc.,* 147 B.R. at 656 (there is a strong presumption "that in making a business

decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

31.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See *e.g., In re Lionel Corp.*, 722 F.2d at 1071. In fact, the paramount goal in any proposed sale of property is to maximize the proceeds received by the estate. *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.,* 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greater overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

32.    In this case, as set forth more fully herein, the Debtor submits that the decision to proceed with the sale of the Acquired Assets pursuant to the Bidding Procedures is based upon sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071.

33.    Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated

by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See*, *e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

34.     The Debtor submits that more than ample business justification exists to sell the Acquired Assets pursuant to the Bidding Procedures. The prompt sale of the Acquired Assets presents the best opportunity to maximize value for the Debtor's estate in light of the need to manage and transition the Acquired Assets to a buyer. In addition, the Debtor believes that the Bidding Procedures are the best method by which they can obtain the best price for the Acquired Assets and provide interested parties with accurate and reasonable notice of the sale. The Bidding Procedures will allow the Debtor to sell the Acquired Assets in a fair and open fashion that will ensure that the Debtor will receive the best possible consideration for the Acquired Assets by helping ensure a competitive and fair bidding process.

35.     The Debtor believes the sale of the Acquired Assets must occur quickly in order to maximize value in this Chapter 11 Case, and that every additional day spent in chapter 11 increases the risk of business loss and value deterioration. Absent a prompt sale pursuant to the procedures and timelines proposed, the Debtor believes that the value of the Acquired Assets may be compromised.  In particular, the Debtor might not be able to continue to maintain normal operations

21

or make payroll.  In light of the significant efforts which the Debtor has already undertaken prior to the filing of this Chapter 11 Case to find a purchaser, the Debtor believes that a targeted and expedited sale process is the most likely method to achieve the highest or otherwise best offer for the Acquired Assets. The Debtor respectfully submits that most potentially interested parties have already engaged in meaningful discussions with the Debtor, and several of them have had the opportunity to make site visits and conduct at least some diligence concerning the Debtor's business and the Acquired Assets. Additionally, both the Debtor and Stalking Horse Purchaser were represented by practical and experienced advisors and attorneys in negotiating the Stalking Horse APA. Accordingly, the relief sought by this Motion not only is reasonable, but necessary, to maximize the value of the Debtor's estate for the benefit of its creditors and other stakeholders.

**B.      Notice of the proposed sale is adequate under the circumstances**

36.      The notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets.

37.      All parties in interest as described in paragraphs 22 and 23 above will receive notice of the sale proposed herein and will be provided with an opportunity to be heard. Additionally, all counterparties to Executory Contracts and Unexpired Leases will be provided with notice of the potential assumption, assignment and/or transfer of their Executory Contracts and Unexpired Leases, as well as an opportunity to be heard. The Debtor submits that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code and the Bankruptcy Rules.

**C.      The consideration to be received by the Debtor is fair and reasonable**

38.      Courts have recognized that bidding procedures which are intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate

and are therefore appropriate and desirable in bankruptcy sales. *See In re Integrated Res.*, 147 B.R. at 659 (such procedures are created to "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

39.     The proposed Bidding Procedures are designed to maximize the value received for the Acquired Assets. The proposed process allows for an expedited auction while providing potential bidders with time and information to submit competing bids. Accordingly, the purchase price for the Acquired Assets will be subject to market testing in a court-supervised auction process, thereby ensuring that the purchase price for the Acquired Assets is fair and reasonable.

**D.      The sale is being proposed in "good faith" within the meaning of section 363(m) of the Bankruptcy Code**

40.     The Debtor requests that the Court find that the Successful Bidder(s) and/or Back-Up Bidder(s) are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Acquired Assets.

41.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) ... of this section of a sale . . . of property does not affect the validity of a sale ... under such authorization to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. §363(m).

42.     Section 363(m) of the Bankruptcy Code thus protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the Acquired Assets if the order authorizing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets. Additionally, courts have

found that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365. *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors. Inc.*, 141 F.3d 490, 497-98 (3d Cir. 1998). In *Krebs*, the Third Circuit considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." *Id.* at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the court in *Krebs* concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in *Krebs*, the Executory Contracts and Unexpired Leases are contracts that may be assumed, assigned and/or transferred pursuant to section 365 of the Bankruptcy Code. In light of *Krebs*, the Debtor respectfully submits that section 363(m) applies to protect the Successful Bidder and/or Back-Up Bidder with respect to the Executory Contracts and Unexpired Leases in addition to the other Acquired Assets to be sold.

43.     As required by section 363(m) of the Bankruptcy Code, the Debtor and the Stalking Horse Purchaser have negotiated the Stalking Horse APA in good faith, without collusion, and at arm's length. The Bidding Procedures have also been proposed in good faith, without collusion, and provide for both the Debtor and any potential purchaser to act in good faith in negotiating the sale of the Acquired Assets and the assignment of the Executory Contracts and Unexpired Leases related thereto. Although the Bankruptcy Code does not define "good faith purchaser," courts have found that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305

(Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D. N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

44.     Here, the sale of the Acquired Assets and the assignment and/or transfer of the Executory Contracts and Unexpired Leases, which will be designated by any Successful Bidder, is or will be in good faith. As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel and all negotiations have been and will continue to be conducted on an arm's length, good faith basis. Moreover, there is no evidence of fraud or collusion in terms of the proposed sale. With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, the Successful Bidder(s) and Back-Up Bidder(s) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

**E.     The proposed sale satisfies the requirements
        of section 363(f) of the Bankruptcy Code**

45.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a *bona fide* dispute; or (e) the party asserting the lien, claim, or, interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f);

*Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See*, *e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). In this case, GMES holds a first priority lien on all of the Debtor's assets and has consented to the proposed sale pursuant to section 363(f)(2) and its claim will also be paid in full pursuant to 363(f)(3). In short, the Debtor expects that one or more of the requirements of section 363(f) can be met with respect to each lien, claim or interest that may be asserted against the Acquired Assets, as will be demonstrated at the Sale Hearing, and therefore submits that approving the sale of the Acquired Assets free and clear of all of all liens, claims, encumbrances and other interests is warranted. The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a buyer arising from a seller's pre-sale conduct. Moreover, without such assurances, the Debtor would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts. To that end, the Successful Bidder(s) should not be liable under any theory of successor liability relating to the Debtor's business, but should own the Acquired Assets free and clear.

**F.    Assumption and assignment of Executory Contracts and Unexpired Leases should be approved**

46.    To facilitate and effectuate the sale of the Acquired Assets, the Debtor seeks authority to assume, assign and/or transfer various Executory Contracts and Unexpired Leases to the Successful Bidder(s) or Back-Up Bidder(s) to the extent requested by such Successful Bidder(s)

or Back-Up Bidder(s). Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), predecessor to Bankruptcy Code Section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *see also Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

47.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtor has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding and noting that "[t]he chief determinant of adequate assurance of future performance is whether rent will be paid").

48.     The Successful Bidder(s) or Back-Up Bidder(s) may want to take assignment of certain executory contracts and unexpired leases related to the Acquired Assets. To the extent Executory Contracts and Unexpired Leases are identified for assumption, assignment and/or

27

transfer, the Debtor believes it can and will demonstrate that all requirements for assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases will be satisfied at the Sale Hearing. The Debtor, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Acquired Assets. Further, for the reasons stated throughout this Motion, the Debtor, in exercising sound business judgment, believes that selling the Acquired Assets and assuming, assigning and/or transferring to the Successful Bidder(s) or Back-Up Bidder(s) the Executory Contracts and Unexpired Leases would be in the best interest of its estate. Moreover, the Debtor will provide all parties to the Executory Contracts and Unexpired Leases an opportunity to be heard.

49.     Thus, the Debtor requests that the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases be approved.

50.     The Debtor also requests authorization to pay the GMES Administrative Claim at the time of closing.

**G.      The Bid Protection Amount is reasonable and should be approved**

51.     The Stalking Horse Purchaser and its advisors have made a substantial investment of time and have incurred substantial expenses in connection with the negotiation and execution of the Stalking Horse APA. In consideration of the time, effort, and resources expended to facilitate the proposed sale, and the benefit to the Debtor's estate of having an established "floor" bid embodied by the Stalking Horse APA, the Debtor has agreed to pay the Stalking Horse Purchaser the Bid Protection Amount in the event that the Acquired Assets are sold to another Bidder.

52.     Break-up fees and expense reimbursement are a normal and, in many cases, necessary components of significant sales conducted under section 363 of the Bankruptcy Code. "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation ha[s] a duty to encourage bidding, breakup

28

fees can be *necessary* to discharge [such] duties to maximize values." *In re Integrated Resources,*

*Inc.*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992) (emphasis in original). Specifically, "break-up fees

and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter

the bidding by providing some form of compensation for the risks it is undertaking." *In re 995*

*Fifth Ave Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted); *accord In re*

*Integrated Resources, Inc.*, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence

negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indust., Inc.*, 140 B.R.

191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an

initial bid for fear that their first bid will be shopped around for a higher bid from another bidder

who would capitalize on the initial bidder's . . . due diligence").

53.     Bankruptcy courts have approved payments similar to the Bid Protection Amount

under the "business judgment rule," and such arrangements are presumptively valid provided that

(i) a debtor's decision to agree to a break-up fee is not tainted by bad faith or self-dealing, (ii) the

break-up fee does not hamper bidding, and (iii) the amount of the break-up fee is reasonable. *In re*

*Integrated Resources, Inc.*, 147 B.R. at 656-57.

54.     The requested Bid Protection Amount was negotiated by the parties in good faith

and at arm's length. The proposed Bidding Procedures are specifically calculated to encourage

competitive bidding, and the Stalking Horse APA (which represents the culmination of substantial

negotiations with the Stalking Horse Purchaser) provides a necessary template which will make the

submission and evaluation of competing bids simpler and more efficient for all interested parties,

as well as establishing a fair and reasonable minimum value to be received in exchange for Acquired

Assets. In the event the Debtor is able to secure a higher or otherwise better bid at the Auction it

will be because of, and not in spite of, the bid submitted by the Stalking Horse Purchaser. The

requested Bid Protection Amount, which was negotiated element of the Stalking Horse APA,

29

therefore will necessarily encourage bidding and facilitate a fair, productive and efficient auction process. Moreover, there is a basis for the Court to find that the requested Bid Protection Amount is reasonable in light of the time and effort undertaken by the Stalking Horse Purchaser in negotiating the Stalking Horse APA, the benefit to the Debtor of securing a stalking horse bid, and the risk the Stalking Horse Purchaser has undertaken that it may be outbid at the Auction.

**H.      Relief from the fourteen-day waiting periods under Bankruptcy Rules 6004(h) and 6006(d) is appropriate**

55.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

56.      The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, Collier on Bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of their intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

57.     Accordingly, the Debtor hereby requests that the Court waive the stay period under Bankruptcy Rules 6004(h) and 6006(d). Moreover, in the event any party does appeal the Bidding Procedures Order or the Sale Order, the Debtor respectfully submits that the relevant order should not be stayed pending such appeal unless the appellant posts a bond in favor of the Debtor in an amount no less than the total consideration to be received under the Stalking Horse APA or the Successful Bid submitted at the Auction.

## CONCLUSION

**WHEREFORE**, for the reasons stated above, the Debtor respectfully requests: (a) entry of the proposed Bidding Procedures Order, substantially in the form attached hereto as ***Exhibit B***; (b) following the Sale Hearing, entry of one or more Sale Order(s) authorizing the Debtor to sell the Acquired Assets to the Successful Purchaser(s) and/or Backup Bidder(s) as a good faith buyer as determined in accordance with the Bidding Procedures and for related relief; and (c) such other and further relief as the Court deems just and proper.

Dated: February 19, 2025
    Albany, New York                         WHITEMAN OSTERMAN & HANNA LLP


                                             By: /s/ Justin Heller
                                                 Justin A. Heller, Esq.
                                                 Matthew M. Zapala, Esq.
                                                 80 State Street, 11th Floor
                                                 Albany, NY 12207
                                                 Telephone: (518) 487-7600
                                                 jheller@woh.com
                                                 mzapala@woh.com