**ASSET PURCHASE AGREEMENT**

**by and between**

**PIPELINE PACKAGING CORPORATION**

**and**

**SKS BOTTLE AND PACKAGING, INC.**

**Dated as February 19, 2025**

18335334.9

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND RULES OF CONSTRUCTION ........................................... 1

    1.1 Definitions ................................................................................................................. 1

    1.2 Rules of Construction ................................................................................................ 8

ARTICLE II. PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES .......... 8

    2.1 Purchase and Sale of Assets ..................................................................................... 8

    2.2 Assignment and Assumption of Liabilities .............................................................. 10

    2.3 Excluded Assets ........................................................................................................ 10

    2.4 No Other Liabilities Assumed .................................................................................. 10

    2.5 Addition or Deletion of Assumed Executory Contracts ........................................... 11

    2.6 Deemed Consents ...................................................................................................... 11

ARTICLE III. BASIC TRANSACTION ................................................................................... 11

    3.1 Payment of Purchase Price ........................................................................................ 11

    3.2 Proration of Real and Personal Property Taxes ....................................................... 12

    3.3 Effective Time .......................................................................................................... 12

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLER ............................... 12

    4.1 Validity of Agreement .............................................................................................. 12

    4.2 Organization, Standing and Power ........................................................................... 12

    4.3 No Conflicts or Violations ........................................................................................ 12

    4.4 Title to Assets; Assets Necessary to Business ......................................................... 13

    4.5 Inventory ................................................................................................................... 13

    4.6 Accounts Receivable ................................................................................................. 13

    4.7 Property ..................................................................................................................... 13

    4.8 Contracts ................................................................................................................... 13

    4.9 Intellectual Property .................................................................................................. 14

    4.10 Legal Proceedings ................................................................................................... 15

    4.11 Permits and Compliance with Law ......................................................................... 15

    4.12 Environmental Matters ............................................................................................ 16

    4.13 Employee Benefit Plans .......................................................................................... 16

    4.15 Absence of Changes ................................................................................................ 16

    4.16 Affiliate Transactions ............................................................................................. 17

    4.17 Brokers .................................................................................................................... 17

4.18 Cure Amounts ........................................................................... 18

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 18

5.1 Validity of Agreement .................................................................. 18

5.2 Organization, Standing and Power ..................................................... 18

5.3 No Conflicts or Violations ............................................................. 18

5.4 Brokers ................................................................................ 18

5.5 Litigation ............................................................................. 19

ARTICLE VI. COVENANTS OF SELLER; OTHER AGREEMENTS ................................. 19

6.1 Consents and Approvals ................................................................ 19

6.2 Conduct of Business ................................................................... 19

6.3 Access; Deliveries .................................................................... 19

6.4 Notification of Certain Matters; Schedules ........................................... 19

6.5 Commercially Reasonable Efforts ...................................................... 20

6.6 Bankruptcy Court Matters ............................................................. 20

ARTICLE VII. COVENANTS OF BUYER ..................................................... 21

7.1 Consents and Approvals ................................................................ 21

7.2 Assumed Obligations ................................................................... 21

7.3 Commercially Reasonable Efforts ...................................................... 22

7.4 Future Performance .................................................................... 22

ARTICLE VIII. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER ...................... 22

8.1 Representations and Warranties; Covenants ............................................ 22

8.2 Bankruptcy Conditions ................................................................ 22

8.3 Saratoga Lease ........................................................................ 22

8.4 Employees ............................................................................. 23

8.5 Litigation ............................................................................ 23

8.6 Closing Deliveries .................................................................... 23

ARTICLE IX. CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ...................... 23

9.1 Representations and Warranties; Covenants ............................................ 23

9.2 Sale Order ............................................................................ 23

9.3 Litigation ............................................................................ 24

9.4 Consideration ......................................................................... 24

9.5 Deliveries at the Closing ............................................................. 24

ARTICLE X. CLOSING ................................................................... 24

10.1 Closing ........................................................................................................... 24

10.2 Deliveries by Seller ...................................................................................... 24

10.3 Deliveries by Buyer ...................................................................................... 25

10.4 Form of Instruments ..................................................................................... 25

ARTICLE XI. TERMINATION ................................................................................ 25

11.1 Termination ................................................................................................... 25

11.2 Effect of Termination or Breach .................................................................. 26

ARTICLE XII. ADDITIONAL POST-CLOSING COVENANTS ........................... 26

12.1 Employees ..................................................................................................... 26

12.2 Employee Benefit Plans ............................................................................... 26

12.3 Sellers' Cooperation in Hiring of Employees .............................................. 26

12.4 WARN Act .................................................................................................... 27

12.5 Joint Post-Closing Covenant of Buyer and Seller ....................................... 27

12.6 Name Changes .............................................................................................. 27

12.7 Accounts Receivable/Collections ................................................................. 27

12.8 Access to Information ................................................................................... 27

ARTICLE XIII. MISCELLANEOUS ....................................................................... 28

13.1 Expenses ....................................................................................................... 28

13.2 Amendment and Waiver ............................................................................... 28

13.3 Notices .......................................................................................................... 28

13.4 Counterparts and Execution ......................................................................... 29

13.5 Headings ....................................................................................................... 30

13.6 SUBMISSION TO JURISDICTION ............................................................ 30

13.7 Governing Law ............................................................................................. 30

13.8 Binding Nature; Assignment ........................................................................ 30

13.9 No Third Party Beneficiaries ....................................................................... 30

13.10 Tax Matters ................................................................................................. 30

13.11 Construction ................................................................................................ 31

13.12 Public Announcements ............................................................................... 31

13.13 Entire Understanding .................................................................................. 31

13.14 Closing Actions .......................................................................................... 31

13.15 Conflict ....................................................................................................... 32

13.16 No Survival ................................................................................................. 32

13.17 Bankruptcy Court Approval/Sale Procedures Order..............................................32

13.18 Confidentiality ..................................................................................................32

13.19 Unenforceability, Severability .............................................................................32

13.20 Specific Performance ..........................................................................................32

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bidding Procedures |
| Exhibit B | Form of Bidding Procedures Order |
| Exhibit C | Form of Sale Order |
| Exhibit D | Form of Assumption Agreement |
| Exhibit E | Form of Bill of Sale |
| Exhibit F | Form of Assignment of Trademarks |
| Exhibit G | Form of Assignment of Domain Names |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Permitted Liens |
| Schedule 2.1(a)(iv) | Assumed Executory Contracts |
| Schedule 2.5(b) | Cure Costs |
| Schedule 4.3 | Conflicts or Violations |
| Schedule 4.4(a) | Title to Assets |
| Schedule 4.4(b) | Acquired Assets |
| Schedule 4.5 | Inventory |
| Schedule 4.6 | Accounts Receivable |
| Schedule 4.7 | Real Property of Seller |
| Schedule 4.8(a) | Material Contracts of Seller |
| Schedule 4.8(b) | Defaulted Material Contracts |
| Schedule 4.9 | Business Intellectual Property of Seller |
| Schedule 4.10 | Legal Actions |
| Schedule 4.12 | Environmental Matters |
| Schedule 4.13(a) | Employee Benefit Plans |
| Schedule 4.14 | Absence of Changes |
| Schedule 4.15 | Affiliate Transactions |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "***Agreement***"), dated as of this 19th day of February 2025, is by and between Pipeline Packaging Corporation, an Ohio corporation ("***Buyer***"), and SKS Bottle and Packaging, Inc., a New York corporation ("***Seller***").

WHEREAS, Seller has filed a Chapter 11 petition pursuant to the Bankruptcy Code;

WHEREAS, on _____, 2025, the Bankruptcy Court entered an order (the "***Sales Procedure Order***") setting forth the procedures for conducting the sale of the Acquired Assets and the assumption of the Assumed Obligations hereunder and the execution and delivery of this Agreement;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Acquired Assets, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365 and 1146(c) of the Bankruptcy Code; and

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyer also desires to assume, and Seller desires to assign and transfer, the Assumed Obligations.

In consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.

## DEFINITIONS AND RULES OF CONSTRUCTION

**1.1** <u>Definitions</u>. Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"***Accounts Receivable***" shall have the meaning set forth in **<u>Section 2.1(a)(ii)</u>**.

"***Acquired Assets***" shall have the meaning set forth in **<u>Section 2.1(a)</u>** hereof.

"***Actions***" shall have the meaning set forth in **<u>Section 5.5</u>** hereof.

"***Affiliate***" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"***Agreement***" means this Asset Purchase Agreement, including all Exhibits and Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"***Allocation***" shall have the meaning set forth in **<u>Section 13.10(b)</u>** hereof.

1

"*Alternate Bid Expiration Date*" shall have the meaning set forth in **Section 6.6(f).**

"*Alternate Bidder*" has the meaning set forth in the Bidding Procedures.

"*Alternative Transaction*" means any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization or liquidation, share exchange, business combination, joint venture, debt incurrence, or similar transaction involving the Seller (including, for the avoidance of doubt, a transaction premised on a sale of assets under Section 363 of the Bankruptcy Code), or the debt, equity, or other interests in the Seller that transfers to or vests ownership of the business or substantially all of its assets in any party other than Buyer.

"*Assignment of Domain Names*" shall have the meaning set forth in **Section 8.6.**

"*Assignment of Trademarks*" shall have the meaning set forth in **Section 8.6.**

"*Assumption Agreement*" shall have the meaning set forth in **Section 8.6**.

"*Assumed Executory Contracts*" shall have the meaning set forth in **Section 2.1(a)(iv)**.

"*Assumed Obligations*" shall have the meaning set forth in **Section 2.2(a)** hereof.

"*Auction*" means the auction for the sale of the Acquired Assets conducted by Seller if, and only if, any Qualified Bid (other than this Agreement) is received pursuant to the terms and conditions of the Bidding Procedures Order.

"*Avoidance Action*" or "*Avoidance Actions*" shall have the meaning set forth in **Section 2.3(b)** hereof.

"*Bankruptcy Code*" means title 11 of the United States Code, as amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of New York.

"*Benefit Plan*" means any "employee benefit plan" (including, without limitation, "plans" as defined in ERISA Section 3(3)), profit sharing, deferred compensation, bonus, stock option, stock purchase, vacation pay, holiday pay, pension, retirement plans, medical and any other benefit plan or program of any kind regardless of whether any such plan is written or oral or provided under a collective bargaining or other similar arrangement.

"*Bid Deadline*" shall have the meaning set forth in **Section 6.6(c).**

"*Bid Protection Amount*" means (a) a stalking-horse expense reimbursement of up to $50,000.00 plus (b) a break-up fee equal to 5.0% of the Purchase Price.

"***Bidding Procedures***" means bid procedures, substantially in the form attached hereto as **Exhibit A** (with changes approved by Buyer and Seller in accordance with this Agreement), to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"***Bidding Procedures Motion***" means the motion filed by Seller with the Bankruptcy Court seeking entry of the Bidding Procedures Order approving, among other things, the Bidding Procedures.

"***Bidding Procedures Order***" means an Order of the Bankruptcy Court, substantially in the form attached hereto as **Exhibit B** (with changes approved by Buyer and Seller in accordance with this Agreement).

"***Bill of Sale***" shall have the meaning set forth in **Section 8.6.**

"***Books and Records***" means all books and records of Seller, including all records that are located at the Operating Locations and all records regarding the marketing by Seller and its representatives of Seller's assets and businesses for sale; provided, however, that "***Books and Records***" shall not include any of Seller's minute books, corporate seals, stock books and such other books and records as pertain only to the organization, existence, share capitalization or debt financing of Seller, as well as originals of Tax Returns or copies of documents relating to Excluded Environmental Liabilities or employee records of employees who are not Rehired Employees.

"***Business Day***" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York.

"***Business Intellectual Property***" means all Intellectual Property owned or used by Seller.

"***Buyer***" shall mean Pipeline Packaging Corporation, an Ohio corporation.

"***Cash***" shall have the meaning set forth in **Section 2.3(a)** hereof.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.).

"***Chapter 11 Case***" means the case commenced by Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"***Claim***" means claim as defined in 11 U.S.C. §101(5).

"***Closing***" shall have the meaning set forth in **Section 10.1**.

"***Closing Date***" shall have the meaning set forth in **Section 10.1**.

"***COBRA***" means Part 6 of Subtitle 6 of Title I of ERISA or Section 4980B of the Code, or any similar state law.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Contract***" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral, to which Seller is a party.

"***Controlled Group***" means any entity that, together with Seller, is treated as a single employer under Section 414 of the Code.

"***Cure Costs***" shall have the meaning set forth in **Section 2.5(b)**.

"***Data Privacy and Protection Laws***" shall mean all federal, state and international data, information, data protection, information security and privacy laws, including but not limited to international data breach notification and/or privacy laws such as the General Data Protection Regulation (GDPR), state data breach notification Laws, state privacy Laws such as the California Consumer Privacy Protection Act (CCPA), and federal statutes or regulations such as the Health Insurance Protection and Accountability Act (HIPAA) and the Graham-Leach-Bliley Act (GLBA).

"***Environmental Requirements***" means all federal, state and local statutes, regulations, ordinances and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety or pollution or protection of the environment.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and all regulations issued thereunder.

"***Equipment***" shall have the meaning set forth in **Section 2.1(a)(i)**.

"***Excluded Assets***" shall have the meaning set forth in **Section 2.3**.

"***Excluded Contracts***" shall have the meaning set forth in **Section 2.3(c)**.

"***Excluded Environmental Liabilities***" means any Liability or investigatory, corrective or remedial obligation, whenever arising or occurring, arising under or relating to Environmental Requirements with respect to Seller or any of its predecessors or Affiliates, the Acquired Assets or any current or former properties, facilities or operations of Seller, or any of its predecessors or Affiliates.

"***Exhibits***" means the exhibits hereto.

"***Final Order***" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have

4

been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"*GAAP*" means United States generally accepted accounting principles, consistently applied.

"*Governmental Authority*" means any U.S. federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"*Hazardous Substances*" means (a) petroleum or petroleum products, fractions, derivatives or additives, natural or synthetic gas, asbestos urea formaldehyde foam insulation, polychlorinated biphenyls and radon gas; (b) any substances, materials or waste defined as or included in the definition of hazardous wastes, hazardous materials, extremely hazardous wastes, extremely hazardous substances, restricted hazardous wastes, toxic substances, toxic chemicals or toxic pollutants, contaminants or pollutants or words of similar import under any Environmental Requirements; (c) radioactive materials, substances and waste, and radiation; and (d) any other substances, materials or waste exposure that is regulated under any Environmental Requirements or with respect to which Liability or standards of conduct are imposed under any Environmental Requirements.

"*HIPAA*" means the Health Insurance Portability and Accountability Act of 1996, as amended.

"*Indebtedness*" means at a particular time, without duplication, (a) any obligation for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (b) any obligation evidenced by any note, bond, debenture or other debt security, (c) any obligation for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the ordinary course of business), (d) any commitment by which a Person assures a creditor against loss (including, without limitation, contingent reimbursement obligations with respect to letters of credit), (e) any obligation guaranteed in any manner by a Person (including, without limitation, guarantees in the form of an agreement to repurchase or reimburse), (f) any obligations under capitalized leases (in accordance with GAAP) with respect to which a Person is liable, contingently or otherwise, as obligor, guarantor or otherwise, or with respect to which obligations a Person assures a creditor against loss, (g) any obligation secured by a Lien on a Person's assets, and (h) any accrued and unpaid interest with respect to the foregoing (in the case of prepayments or otherwise).

"*Intellectual Property*" means all of the following in any jurisdiction throughout the world: (a) patents, patent applications and patent disclosures; (b) trademarks, service marks, trade names, corporate names, logos and slogans (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill

5

associated with each of the foregoing; (c) copyrights and copyrightable works; (d) registrations and applications for any of the foregoing; (e) trade secrets, know-how and inventions; and (f) computer software (including but not limited to source code and executable code).

"*Inventory*" shall have the meaning set forth in **Section 2.1(a)(vii)**.

"*Knowledge*", with respect to Seller, means the knowledge of any director or of Ken Horan or Steve Horan.

"*Landlord*" has the meaning set forth in **Section 8.3**.

"*Liability*" means any liability (whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted).

"*Lien*" or "*Liens*" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, mortgage, pledge, preference, security agreement or option of any kind or nature, including without limitation, (a) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing and (b) any assignment or deposit arrangement in the nature of a security device.

"*Material Adverse Effect*" means, with respect to any Person, any change or event that is materially adverse to the business, assets, results of operations, condition (financial or otherwise) or operations of such Person and its Subsidiaries, taken as a whole.

"*Material Contract*" or "*Material Contracts*" shall have the meaning set forth in **Section 4.8(a)** hereof.

"*Order*" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"*Operating Location*" means the Real Property used in the business of the Seller.

"*Permitted Liens*" means (a) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates that do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (b) Liens for Taxes not yet due and payable, (c) Liens created by Buyer or its Affiliates or agents and (d) Liens disclosed on **Schedule 1.1** hereto.

"*Permits*" means all permits, licenses, approvals, registrations and authorizations issued by any Governmental Authority and all pending applications therefor.

"*Person*" means any corporation, partnership, joint venture, limited liability company, organization, entity, Governmental Authority or natural person.

"*Prepayments*" shall have the meaning set forth in **Section 2.1(a)(viii)**.

6

"**Purchase Price**" shall have the meaning set forth in **Section 3.1(a)**.

"**Real Property**" means all land and all buildings, structures, and other improvements located thereon, and all easements, rights of way, servitudes, tenements, appurtenances, privileges and other rights with respect thereto.

"**Rehired Employee**" shall have the meaning set forth in **Section 12.1(a)**.

"**Release**" shall have the meaning set forth in CERCLA.

"**Rule**" or "**Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Sale Order**" means the order of the Bankruptcy Court, substantially in the form attached hereto as **Exhibit C** or in such other form approved by Buyer, to be entered by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code, among other things, (a) approving this Agreement and the transactions contemplated hereby; (b) approving the sale of the Acquired Assets to Buyer free and clear of all Liens (other than the Assumed Obligations and the Permitted Liens) pursuant to section 363(f) of the Bankruptcy Code; (c) approving the sale, assumption and assignment of the Assumed Executory Contracts pursuant to Sections 363(f) and 365 of the Bankruptcy Code; and (d) finding that Buyer is a good-faith Buyer entitled to the protections of section 363(m) of the Bankruptcy Code.

"**Sales Procedure Order**" shall have the meaning set forth in the Recitals.

"**Saratoga Lease**" shall have the meaning set forth in **Section 8.3.**

"**Schedules**" means the schedules attached hereto.

"**Security Breaches**" has the meaning set forth in **Section 4.9(c)**.

"**Seller**" shall mean SKS Bottle and Packaging, Inc, a New York corporation.

"**Seller Employee Benefit Plan**" or "**Seller Employee Benefit Plans**" shall have the meaning set forth in **Section 4.13(a)**.

"**Subsidiary**" means, with respect to any Person, any corporation or other legal entity of which such Person (either alone or through or together with any other Subsidiary) (a) owns, directly or indirectly, more than 50% of the stock or other equity interests the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity, (b) in the case of a limited liability company or a partnership, serves as managing member or general partner, as the case may be, or owns a majority of the equity interests or (c) otherwise has the ability to elect a majority of the directors, trustees or managing members thereof.

"**Tax**" and, with correlative meaning, "**Taxes**" mean with respect to any Person (a) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including, without limitation, any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, *ad valorem,* value added, transfer, capital stock franchise,

profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental (including taxes under Section 59A of the Code) or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax Liability of any other Person.

"***Tax Return***" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"***Transition Period***" shall have the meaning set forth in **Section 12.8**.

"***Unassumed Liabilities***" shall have the meaning set forth in **Section 2.4**.

"***Warehouse Lease***" shall have the meaning set forth in **Section 8.3**.

"***WARN Act***" shall have the meaning set forth in **Section 12.4**.

**1.2**    Rules of Construction. Unless the context otherwise clearly indicates, in this Agreement:

(a)    the singular includes the plural;

(b)    "includes" and "including" are not limiting;

(c)    "may not" is prohibitive and not permissive; and

(d)    "or" is not exclusive.

## ARTICLE II.

## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

**2.1**    Purchase and Sale of Assets.

(a)    Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer, free and clear of all Liens (except for the Assumed Obligations and Permitted Liens), and Buyer shall purchase, acquire and take assignment and delivery of, for the consideration specified in **Section 3.1**, all of Seller's properties, assets, rights, titles and interests of every kind and nature as of the Closing Date, whether tangible or intangible, real or personal and wherever located, including, without limitation, those located in Reno, Nevada, and Saratoga Springs, New York, and including, without limitation, all of the following assets but excluding only the Excluded Assets pursuant to

8

**Section 2.3** (all of the assets to be sold, assigned, transferred and delivered to Buyer hereunder are collectively referred to herein as the "***Acquired Assets***"):

        (i)      all machinery, equipment (including all transportation and office equipment), furniture, office and other supplies, computer hardware and equipment, telephone systems, furnishings, automobiles, trucks, vehicles, tools, tooling, dies, molds and parts, conveyors, flow racking and similar property and all rights to all warranties and licenses received from manufacturers and lessors thereof (collectively, the "***Equipment***");

        (ii)      all accounts and notes receivable (whether current or noncurrent) (the "***Accounts Receivable***") and all causes of action pertaining to the collection of the foregoing;

        (iii)      all Intellectual Property, along with all income, royalties, damages and payments due or payable with respect thereto as of the Closing or thereafter, as well as all social media accounts, logins, passwords and all related content;

        (iv)      all of Seller's rights existing under the Contracts set forth on **Schedule 2.1(a)(iv)** (collectively, the "***Assumed Executory Contracts***");

        (v)      with respect to the Saratoga facility, all leasehold improvements and fixtures located at the Saratoga facility;

        (vi)      to the extent assignable under applicable law, all Permits;

        (vii)      all inventories of raw materials, work in process, semi-finished and finished goods, replacement and spare parts, packaging materials, operating supplies, and fuels, wherever located (collectively, "***Inventory***");

        (viii)      all rights relating to credits, prepaid expenses, deferred charges, advanced payments, security deposits, and prepaid items (collectively, "***Prepayments***");

        (ix)      all office supplies, production supplies, spare parts and other miscellaneous supplies, wherever located;

        (x)      all Books and Records;

        (xi)      except as provided in **Section 2.3(b)**, any and all Claims arising out of or relating to any Acquired Asset; and

        (xii)      all goodwill associated with Seller's businesses or the Acquired Assets.

        (b)      All of the Acquired Assets shall be sold, assigned, transferred, conveyed and delivered to Buyer free and clear of all Liens (other than the Assumed Obligations and the Permitted Liens), whether arising prior to or subsequent to the date on which Seller commenced the Chapter 11 Case in the Bankruptcy Court.

18335334.9

**2.2**    <u>Assignment and Assumption of Liabilities</u>.

(a)    Subject to the terms and conditions set forth in this Agreement, at the Closing, Buyer shall assume from Seller, and thereafter be responsible for the payment, performance and/or discharge in accordance with their terms, only the following liabilities and obligations of Seller (all such liabilities and obligations herein called the "***Assumed Obligations***"): obligations under the Assumed Executory Contracts first arising after the Closing.

(b)    Notwithstanding anything in this Agreement to the contrary, Seller hereby acknowledge and agree that Buyer is not assuming from Seller, or is in any way responsible for, the Unassumed Liabilities.

(c)    **Section 2.2(a)** shall not limit any claims or defenses Buyer may have against any party other than Seller. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against Buyer or Seller as compared to the rights and remedies which any such third party would have had against Seller absent the Chapter 11 Case had Buyer not assumed the Assumed Obligations.

**2.3**    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, the following assets of Seller shall be retained by Seller and are not being sold or assigned to Buyer hereunder (all of the following are referred to collectively as the "***Excluded Assets***"):

(a)    all cash (including, without limitation, checking account balances, certificates of deposit and other time deposits and petty cash) net of overdrafts ("***Cash***") and marketable and other securities;

(b)    any and all rights under this Agreement, including without limitation all rights to the Purchase Price and avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law, including, without limitation, all rights and avoidance claims of Seller arising under Chapter 5 of the Bankruptcy Code (an "***Avoidance Action***" and collectively the "***Avoidance Actions***");

(c)    all Contracts other than the Assumed Executory Contracts (the "***Excluded Contracts***") and all Permits that are not assignable under applicable law;

(d)    Tax Returns of Seller and related materials to the extent related to such Tax Returns;

(e)    the equity securities or other ownership interest of Seller or any of Seller's Affiliates; and

(f)    all losses, loss carryforwards and rights to receive refunds, credits and loss carry forwards with respect to any and all Taxes of Seller.

**2.4**    <u>No Other Liabilities Assumed</u>. Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Buyer will not assume any obligation of Seller other than the Assumed Obligations. In furtherance and not in limitation of the foregoing, neither Buyer nor any of its Affiliates shall assume, and shall not be deemed to have assumed, any debt, Claim,

10

obligation or other Liability of Seller or any of their predecessor(s) or Affiliate(s) whatsoever, including any and all Excluded Environmental Liabilities, Indebtedness, all Liabilities and obligations in respect of Taxes of Seller, all Liabilities with respect to the Real Property leased by Seller, all Liabilities with respect to Seller Employee Benefit Plans and claims as defined in Section 101(5) of the Bankruptcy Code (collectively, the "**Unassumed Liabilities**"), other than the Assumed Obligations.

2.5    Addition or Deletion of Assumed Executory Contracts.

(a)    From time to time, at any time prior to the Closing, or within thirty (30) days after the Closing, by giving written notice to Seller, Buyer may update **Schedule 2.1(a)(iv)** to add or remove any Contract to or from such Schedule. Any Contract added to either such Schedule shall become an Assumed Executory Contract and shall be included in the Acquired Assets, and all liabilities and obligations first arising after the Closing under such Contract shall be Assumed Obligations. Any Contract so removed from **Schedule 2.1(a)(iv)** shall become an Excluded Asset and shall not be an Acquired Executory Contract and all liabilities and obligations under such Contract shall be Excluded Liabilities.

(b)    Within two Business Days after Buyer gives notice to Seller of the addition of a Contract to **Schedule 2.1(a)(iv)**, Seller shall provide Buyer with Seller's reasonable best estimate of the Cure Costs for the added Contract.  At Closing, Seller shall pay to the applicable third party any and all cure obligations (pursuant to section 365 of the Bankruptcy Code) with respect to any Assumed Executory Contract to the extent set forth on **Schedule 2.5(b)** ("**Cure Costs**").

(c)    Seller shall promptly, but in no event later than ten (10) Business Days after request by Buyer, make such additional filings with the Bankruptcy Court as may be necessary or desirable to effect the provisions of this **Section 2.5**.

2.6    Deemed Consents. For all purposes of this Agreement (including all representations and warranties of Seller contained herein), Seller shall be deemed to have obtained all required consents in respect of the assignment of any Assumed Executory Contract if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order,  Seller is authorized to assume and assign such Assumed Executory Contract to Buyer pursuant to section 365 of the Bankruptcy Code.

## ARTICLE III.

## BASIC TRANSACTION

3.1    Payment of Purchase Price.

(a)    The aggregate consideration for the Acquired Assets (the "**Purchase Price**") shall be an amount equal to $1,500,000.00.

(b)    Payments made pursuant to this **Section 3.1** shall be allocated among the assets purchased in accordance with **Section 13.10(b)**.

**3.2** <u>Proration of Real and Personal Property Taxes</u>. Real and personal property Taxes and assessments on the Acquired Assets for any taxable period commencing prior to the Closing Date and ending after the Closing Date shall be prorated on a per diem basis between Buyer and Seller as of the Closing Date based upon the most recently-available tax records from the applicable Governmental Authorities without regard to any post-Closing adjustment to valuation or Tax rate. All such prorations shall be allocated so that items relating to time periods ending on or prior to the Closing Date shall be allocated to Seller and items relating to time periods beginning after the Closing Date shall be allocated to Buyer; <u>provided</u>, <u>however,</u> that the parties shall allocate any real property Tax in accordance with Section 164(d) of the Code. Seller's portion of all such prorations shall be settled and paid to Buyer on the Closing Date.

**3.3** <u>Effective Time</u>. The Closing shall be effective at 12:01 a.m. on the Closing Date.

# ARTICLE IV.

## <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>

Seller hereby represent and warrant to Buyer as follows as of the date hereof:

**4.1** <u>Validity of Agreement</u>. Subject to any necessary authorization from the Bankruptcy Court, Seller has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The board of directors of Seller has duly approved this Agreement and has duly authorized the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. No other corporate proceedings on the part of Seller are necessary to approve and authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Seller and, subject to any necessary authorization from the Bankruptcy Court, this Agreement constitutes a valid and binding agreement of Seller.

**4.2** <u>Organization, Standing and Power</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of New York. Subject to any necessary authorization from the Bankruptcy Court, Seller has all necessary corporate power and authority to own and operate its properties and to carry on the business now conducted by it. Seller is not in material default under or in material violation of any provision of its certificate of incorporation or by-laws. Subject to any necessary authorization from the Bankruptcy Court, Seller has all requisite power and authority to execute and deliver this Agreement and, subject to obtaining the Sale Order, to perform its obligations hereunder.

**4.3** <u>No Conflicts or Violations</u>. Except as set forth on **<u>Schedule 4.3</u>**, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Seller does not (a) conflict with or result in any breach of any of the terms, conditions or provisions of, (b) constitute a default under, (c) result in a violation of, (d) give any third party the right to modify, terminate or accelerate any obligation under, or (e) require any authorization, consent, approval, exemption or other action by or notice to, or filing with, any Governmental Authority, under the provisions of any of (i) the articles of incorporation or by-laws of Seller, (ii) any indenture, mortgage, lease, loan agreement or other agreement or instrument to

12

which Seller is a party, or (iii) any law, statute, rule or regulation to which Seller is subject, other than to the extent any authorization from the Bankruptcy Court is necessary.

4.4     Title to Assets; Assets Necessary to Business.

(a)     Except as set forth on **Schedule 4.4(a)**, Seller has good and marketable title to, or a valid leasehold interest in, the Acquired Assets subject only to Permitted Liens.

(b)     Except as described on **Schedule 4.4(b)**, the Acquired Assets are in good operating condition (ordinary wear and tear excepted) and are fit for use in the ordinary course of Seller's business, all of which are listed on **Schedule 4.4(b)**.

(c)     The Acquired Assets constitute all of the assets (other than the Excluded Assets) that are necessary in connection with the conduct of Seller's business as presently conducted and the business is conducted only through the Seller.

(d)     Seller does not have any Subsidiaries.

4.5     Inventory. **Schedule 4.5** lists the Inventory and a calculation of the net book value thereof as of the 31st day of January, 2025. Except to the extent of reserves included in the calculation of net book value identified in **Schedule 4.5**, the Inventory is of merchantable quality and usable or salable in the ordinary course of Seller's business.

4.6     Accounts Receivable. **Schedule 4.6** lists as of 2025, (a) each Accounts Receivable, (b) the name of each account debtor, (c) the aging of each Account Receivable and the nature of the transaction in which it arose if other than an account receivable arising in the ordinary course of Seller's business; and a calculation of the net book value of the Accounts Receivable as of 2025.

4.7     Property.

(a)     **Schedule 4.7** contains a true and complete list of all Real Property owned, leased or used by Seller.  Seller has not caused any damage to the Real Property that is required to be repaired upon termination of any applicable lease.

(b)     To the Knowledge of Seller, there are no Contracts, Orders, Permits, conditions or other directives, issued by a Governmental Authority which relate to the future use or require any material change in the present use or operations of the Facilities.

4.8     Contracts.

(a)     Except for the Excluded Contracts, **Schedule 4.8(a)** contains an accurate and complete list of all material Contracts to which Seller is a party or by which any of Seller's assets are bound, including without limitation, all (i) royalty, distribution, sales representative or license Contracts, including licenses of Intellectual Property (excluding "shrink-wrap" and similar intellectual property license agreements for off-the-shelf software), (ii) Contracts with any officer, director or stockholder of Seller providing for annual payments in excess of $50,000, (iii) Contracts or collective bargaining agreements with any labor union or representative of employees of Seller, (iv) Contracts containing any covenant restricting

13

Seller's conduct of its business, (v) leases of personal property providing for annual payments in excess of $20,000, (vi) purchase and sales orders and commitments and agreements or contracts with vendors, contractors or customers in an amount greater than $20,000, (vii) powers of attorney, (viii) loans, financing or other credit arrangements or agreements under which money has been borrowed or loaned (including security agreements relating thereto), (ix) guarantees or similar obligations, and (x) partnership or joint venture agreements (each a "***Material Contract***" and collectively, the "***Material Contracts***").

(b)      Except as set forth on **Schedule 4.8(b)** hereto, Seller (i) is not in material default under any Material Contract, and there is no material breach or material default on the part of Seller nor, to Seller's Knowledge, has any event occurred that, with notice or lapse of time, or both could reasonably be expected to constitute such a material default by Seller or give any party the right to terminate, cancel, accelerate or modify any Material Contract, (ii) has not received written notice that any party to any Material Contract intends to cancel or terminate any Material Contract or not to exercise any renewal or extension options or rights under any Material Contract, or (iii) has not waived or exercised any renewal or extension options or rights under any Material Contract.

**4.9**      Intellectual Property.

(a)      Set forth on **Schedule 4.9** is a complete and correct list of (a) all Business Intellectual Property that is registered or pending registration anywhere in the world, including (1) patents and patent applications, (2) trademark registrations and applications therefor, (3) internet domain names, (4) copyright registrations and applications therefor and (5) descriptions of all proprietary software; and (b) all other trade names, brand names and logos not described under clause (a)(2) of this sentence used by Seller. Except as set forth on **Schedule 4.9**, Seller owns or has a valid and enforceable license to use all of the Business Intellectual Property. The Business Intellectual Property constitutes all the Intellectual Property necessary for the operation of Seller's businesses as currently conducted. Except as set forth on **Schedule 4.9**, to the Knowledge of Seller, no Claim by any third party contesting the validity, enforceability, use or ownership of the Business Intellectual Property by Seller has been made or is currently outstanding. To the Knowledge of Seller, Seller has not infringed, misappropriated or otherwise conflicted with, and the operation of Seller's businesses as currently conducted does not infringe, misappropriate or otherwise conflict with, any Intellectual Property of any third party. Seller has not received any written notice of infringement or misappropriation of any Intellectual Property by Seller. To the Knowledge of Seller, no third party has infringed, misappropriated or otherwise conflicted with any of the Business Intellectual Property.

(b)      Seller is in compliance and, at all times, has been in compliance in all material respects with all relevant laws, Orders, and standards set by industry standard setting organizations, as well as its own rules, policies, and procedures, relating to Data Privacy and Protection Laws.  Seller has complied at all times with requests from data subjects for access to data held by Seller, and any law, Order, or industry standard requirements relating to the registration of data users insofar as the same pertain to any aspect of Seller's business.  Seller has not received any Order or other notification from a Person or a Governmental Authority regarding non-compliance or violation of any data protection principles or law.

14

(c)    At no time has there been (and Seller has received any written or verbal notices of) any actual or reasonably suspected breach of security (including theft, unauthorized use, access, collection, processing, storage, disposal, destruction, transfer, disclosure, interruption, or modification by any Person) ("***Security Breaches***") of (i) the business systems, including information stored or contained therein or transmitted thereby or (ii) any "Personal Information" (as defined under applicable Data Privacy and Protection Laws) or other confidential or proprietary information collected, processed, stored, or maintained by or on behalf of Seller.  Seller has taken reasonable precautions to prevent any such Security Breaches. Seller has, and at all times, has been, in compliance with all Data Privacy and Protection Laws in all respects, and no event or occurrence has ever transpired that would require Seller to provide notice to any Person or Governmental Authority with respect to any Security Breach or under any Data Privacy and Protection Laws.   No unauthorized disclosure has occurred of any third party proprietary or confidential information in the possession, custody, or control of Seller.  No breach has occurred of Seller's security procedures wherein confidential information has been disclosed to an unauthorized third Person or Governmental Authority.

(d)    No proprietary software included in the Business Intellectual Property contains, is derived from, or links to any "open source" or similar software that would require, based on the current use or distribution of such software, the licensing or making available of material source code for such software for the purposes of making derivative works. No Person has access or the contingent right to access any material proprietary source code included in or embodied by the Business Intellectual Property, other than employees or service providers working for the Company who are subject to reasonable written confidentiality agreements.

(e)    No Action has ever been pending, is pending, or, to the Knowledge of Seller, is threatened against Seller alleging a violation of any Person's rights of publicity or privacy or Personal Information or data privacy rights or Data Privacy and Protection Laws. There has never been any actual or reasonably suspected unauthorized access involving Personal Information or other incidents of (i) data security breaches or loss, theft or incident of unauthorized access to or acquisition of Personal Information or (ii) unauthorized use, modification, or disclosure of any Personal Information in the custody or control of Seller. Seller has taken commercially reasonable measures, including any measures required by any laws, to ensure that Personal Information used in the conduct of Seller's business is protected against unauthorized access, use, modification, or other misuse.

**4.10**    Legal Proceedings. Except as set forth on **Schedule 4.10**, (a) there are no Actions pending by or against Seller, or, to the Knowledge of Seller, threatened against Seller, whether at law, in equity or before any Government Authority, whether or not fully covered by insurance; and (b) Seller is not the subject of any Order of any Government Authority having jurisdiction over it in each case which could reasonably be expected to affect the ability of Seller to consummate the transactions contemplated by this Agreement.

**4.11**    Permits and Compliance with Law.

(a)    Seller holds and is in compliance with all material Permits required by it in connection with the conduct of its business as presently conducted and the ownership, use and operation of the Operating Location under all federal, state, and local laws, rules and regulations.

(b)      Seller is currently in compliance in all material respects with all applicable laws (including rules, regulations, codes, judgments, Orders, decrees, rulings, and changes thereunder) of federal, state and local governments (and all agencies thereof), validly asserting jurisdiction over it or over any part of its operations and, except for proceedings or notices that have been resolved prior to the date of this Agreement, no proceedings or written notices have been filed or commenced against Seller alleging any failure to so comply.

**4.12**      Environmental Matters. Except as set forth on **Schedule 4.12**, (a) Seller is in compliance with all Environmental Requirements except where the failure to so be in compliance would not reasonably be expected to have a Material Adverse Effect on the Acquired Assets; (b) no material Release of Hazardous Substances has occurred on or beneath any Operating Location; and (c) no Hazardous Substances are present in any material amounts at any Operating Location other than inventories of Hazardous Substances to be used in the ordinary course of Seller's businesses and wastes generated therefrom (which inventories and wastes, if any, have been and are stored or disposed of in accordance with applicable Environmental Requirements). For each Operating Location, Seller has provided Buyer with a complete and correct copy of the most recent environmental site assessment report available for that location.

**4.13**      Employee Benefit Plans.

(a)      **Schedule 4.13(a)** sets forth a complete and accurate list of each Benefit Plan established or maintained by Seller or to which Seller contributes or has contributed or to which Seller has any Liability or potential Liability (each such plan a "***Seller Employee Benefit Plan***" and collectively, the "***Seller Employee Benefit Plans***").

(b)      Neither Seller nor any member of its Controlled Group has any Liability or potential Liability with respect to any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) that is or was subject to Title IV of ERISA or any "multiemployer plan" within the meaning of Sections 3(37) and 4001(a)(3) of ERISA or any multiple employer plan as defined in Section 413(c) of the Code.

(c)      Seller has not engaged in or failed to engage in, and, to the Knowledge of Seller, no fiduciary of such Seller Employee Benefit Plan has engaged in or failed to engage in, any transaction that would subject any Seller to a tax or penalty imposed under either Section 4975 of the Code or Title I of ERISA.

(d)      Seller and each member of its Controlled Group has complied in all material respects with the requirements of COBRA and HIPAA.

**4.14**      Absence of Changes. Except as set forth on **Schedule 4.14**, since the filing of the Chapter 11 Case there has not been:

(a)      any material damage, destruction or casualty loss (whether or not covered by insurance) suffered by Seller with respect to the Acquired Assets;

(b)      any employment agreement or deferred compensation agreement entered into between Seller and any of its employees providing for payments in excess of $50,000; or any increase in the compensation or benefits payable or to become payable by Seller to any employee

16

or the adoption of any new (or amendment to or alteration of any existing) bonus, incentive, compensation, pension, stock, matching gift, profit sharing, retirement, death benefit or other fringe benefit plan;

(c)     any material increase in the aggregate Indebtedness for borrowed money or any material increase in purchase commitments or other Liabilities incurred by Seller, nor has Seller issued or assumed, guaranteed or endorsed any debt securities or otherwise become responsible for, the obligations of any other Person, nor has there been any material change in any assumption underlying, or method of calculating, any bad debt, contingency or other reserve, except for liabilities, commitments and obligations incurred in the ordinary and usual course of Seller's businesses;

(d)     any material assets or properties acquired (including by lease) by Seller other than in the ordinary course of Seller's businesses or any Lien created on any of the assets of Seller, other than Permitted Liens and those Liens that will be released prior to the Closing in accordance with the Sale Order;

(e)     any material labor dispute involving the employees of Seller;

(f)     any material sale, assignment, transfer or other disposition or license of any assets of Seller or, other than the sale of inventory in the ordinary course of Seller's businesses;

(g)     any amendment of the certificate of incorporation or by-laws of Seller;

(h)     any declaration, payment or setting aside by Seller of any dividend or other distribution of assets, pro rata or otherwise, to its equity holders or any direct or indirect purchase, redemption or retirement or other acquisition by Seller of any shares of its equity securities;

(i)     any capital expenditure or commitment in excess of $50,000 by Seller not fully paid for;

(j)     any amendment, modification or termination of any of the Operating Locations or any exercise of any option thereunder;

(k)     with respect to Seller, any material change in any methods of accounting or accounting practice other than those required by changes in GAAP;

(l)     any transaction entered into of any kind by Seller with any officer, director or equityholder of Seller; or

(m)     any agreement by Seller to do any of the foregoing.

**4.15**     Affiliate Transactions. Except as set forth on **Schedule 4.15** hereto, Seller does not have any loan or advance outstanding to any equityholder, director, employee or consultant of Seller.

**4.16**     Brokers. Neither Seller nor any of its Affiliates have retained any financial advisor, broker, agent, or finder or paid or agreed to pay any financial advisor, broker, agent, or finder on

17

account of this Agreement or the transactions contemplated hereby for which Buyer has or shall have any responsibility or Liability.

**4.17**    Cure Amounts. **Schedule 2.2(a)(ii)** sets forth all of the Cure Costs required to be satisfied for purposes of Seller's assumption and assignment to Buyer of the Assumed Executory Contracts under section 365 of the Bankruptcy Code.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows as of the date hereof:

**5.1**    Validity of Agreement. Buyer has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The board of directors of Buyer has duly approved this Agreement and has duly authorized the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. No other corporate proceedings on the part of Buyer are necessary to approve and authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by Buyer and constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms except that such enforceability may be limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally and (b) equitable principles which may limit the availability of certain equitable remedies (such as specific performance) in certain instances.

**5.2**    Organization, Standing and Power. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the state of its organization. Buyer has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

**5.3**    No Conflicts or Violations. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Buyer do not (a) conflict with or result in any breach of any of the terms, conditions or provisions of, (b) constitute a default under, (c) result in a violation of, (d) give any third party the right to modify, terminate or accelerate any obligation under, or (e) require any authorization, consent, approval, exemption or other action by or notice to, or filing with, any Governmental Authority, under the provisions of any of (i) the organizational documents of Buyer, (ii) any indenture, mortgage, lease, loan agreement or other agreement or instrument to which Buyer is a party, or (iii) any law, statute, rule or regulation to which Buyer is subject, in each case which seeks to restrain, enjoin, or could reasonably be expected to materially delay, the consummation of the transactions contemplated hereby.

**5.4**    Brokers. Neither Buyer nor any of its Affiliates has retained any financial advisor, broker, agent, or finder or paid or agreed to pay any financial advisor, broker, agent, or finder on account of this Agreement or the transactions contemplated hereby for which Seller has or shall have any responsibility or Liability.

18

**5.5**   <u>Litigation</u>. There are no actions, causes of action, Claims, suits, proceedings, orders, writs, injunctions, or decrees ("***Actions***") pending or, to the knowledge of Buyer, threatened against Buyer at law, in equity, or before any Governmental Authority, which seek to restrain, enjoin, or could reasonably be expected to materially delay, the consummation of the transactions contemplated hereby.

## ARTICLE VI.

## COVENANTS OF SELLER; OTHER AGREEMENTS

**6.1**   <u>Consents and Approvals</u>.

(a)   Seller shall make, as reasonably requested by Buyer, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Seller or any of its Affiliates pursuant to any applicable law, statute, regulation, ruling, or Order in connection with this Agreement and the transactions contemplated hereby.

(b)   Seller shall give any other notices to, make any other filings with, and use commercially reasonable efforts to obtain any other authorizations, consents and approvals of, any Governmental Authority in connection with the matters contemplated by this Agreement.

**6.2**   <u>Conduct of Business</u>. Except as is otherwise required by the Bankruptcy Court or by law, Seller covenants that, from and after the date of entry of the Sale Order, they shall conduct their businesses in the ordinary course (except for changes to the conduct of such business approved in writing by Buyer).

**6.3**   <u>Access; Deliveries</u>. From the date of entry of the Sale Order until the Closing, Seller will on reasonable notice give Buyer and its authorized representatives, including its lenders, environmental consultants, during normal business hours, access to the books, records, properties and personnel of Seller in each case related to the Acquired Assets; <u>provided</u>, <u>however,</u> that (a) any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party or its Affiliates, (b) no party shall be required to take any action which would constitute a waiver of the attorney-client privilege and (c) no party need supply the other party with any information which such party is under a legal obligation not to supply. Buyer, and each of its representatives, shall treat and hold as confidential all information of Seller obtained by Buyer pursuant to the foregoing in accordance with the terms and provisions of that certain Non-Disclosure Agreement dated as of November 21, 2024, between Buyer and Seller, which Non-Disclosure Agreement shall remain in full force and effect.

**6.4**   <u>Notification of Certain Matters</u>.

(a)   From and after the date of entry of the Sale Order, Seller shall give notice to Buyer of (i) the occurrence or nonoccurrence of any event that would be reasonably likely to cause either (A) any representation or warranty of Seller contained in this Agreement to be untrue or inaccurate in any material respect at the Closing or (B) a Material Adverse Effect on Seller or the Acquired Assets, and (ii) any material failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

19

(b)      From and after the date of entry of the Sale Order, Seller shall add Buyer to Seller's "special notice list" and otherwise provide notice to Buyer of all matters filed by Seller that are required to be served on Seller's creditors pursuant to the Bankruptcy Code and Rules.

**6.5**    _Commercially Reasonable Efforts_. From and after the date of entry of the Sale Order, Seller shall use commercially reasonable efforts to take or cause to be taken all action and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, Seller will use commercially reasonable efforts to timely obtain any other consent required for the consummation of the transactions contemplated by this Agreement as soon as practicable.

**6.6**    _Bankruptcy Court Matters_.

(a)      _Bidding Procedures Motion_. In connection with the transactions contemplated by this Agreement, Seller shall have filed with the Bankruptcy Court upon the execution of this Agreement by each of the parties, the Bidding Procedures Motion, including the proposed Bidding Procedures Order and appropriate supporting declarations, in each case, in form and substance acceptable to Buyer, and which identifies Buyer as the "stalking horse" for the Acquired Assets.

(b)      _Bankruptcy Procedures Hearing and Bidding Procedures Order_. The Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance acceptable to Buyer and Seller, no later than February 21, 2025.

(c)      _Qualified Bids_. Pursuant to the Bidding Procedures Order, any and all Qualified Bids respecting the Acquired Assets shall have been submitted on or prior to March 5, 2025 (the "**_Bid Deadline_**"). If any Qualified Bid (other than this Agreement) is submitted prior to the Bid Deadline, Seller shall have commenced the Auction on or prior to March 10, 2025.

(d)      _Sale Order_. The Bankruptcy Court shall have entered the Sale Order on or prior to March 12, 2025, which shall be in form and substance acceptable to Buyer and Seller and consistent with **Section 6.6** hereof.

(e)      _Contracts_. Seller shall serve on all non-Seller counterparties to all of their Contracts a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Contracts, stating the Cure Costs for each such Contract and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall be set forth in the Bidding Procedures Order.

(f)      _Alternative Transaction_.  If an Auction is conducted, and Buyer is not the successful bidder at the Auction but is the next highest bidder after the successful bidder at the Auction, Buyer shall serve as an Alternate Bidder and keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable (subject to the terms and conditions of this Agreement), notwithstanding any right of Buyer to otherwise terminate this Agreement pursuant to the terms of this Agreement, until the earlier of (i) thirty (30) days after the date of the sale hearing or (ii) the first Business Day after the closing of a transaction with a successful bidder for the Acquired Assets that is not Buyer (the "**_Alternate Bid Expiration Date_**"); provided, however, that if prior to the Alternate Bid Expiration Date, a successful bidder for the Acquired Assets that

20

is not Buyer fails to consummate its transaction as a result of a breach or failure to perform on the part of such successful bidder, or because a condition in such successful bidder's purchase agreement cannot otherwise be met, and the purchase agreement with such successful bidder is terminated, Buyer (as the Alternate Bidder) will be deemed to have the new prevailing bid, and Seller will be authorized, without further order of the Bankruptcy Court, to, and Buyer (as the Alternate Bidder) shall, subject to the terms and conditions of this Agreement, consummate the transactions contemplated by this Agreement by the later of (x) ten (10) days of becoming the successful bidder and (y) sixty (60) days after the date of the sale hearing, on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction).

(g)     Bid Protections.  Seller hereby confirms that it is critical to the process of arranging an orderly sale of the Acquired Assets to proceed by selecting Buyer to enter into this Agreement in order to present the Bankruptcy Court with arrangements for obtaining the highest realizable price for the Acquired Assets and that, without Buyer having committed substantial time and effort to such process, Seller and Seller's estates would have to employ a less orderly process of sale and thereby incur higher costs and risk attracting lower prices.  Accordingly, the contributions of Buyer to the process have indisputably provided very substantial benefit to Seller and Seller's estates, and Seller acknowledges that Buyer would not have invested the efforts in negotiating and documenting the transaction provided for herein and incurring the obligations to pay its outside advisors and legal counsel if Buyer were not paid the Bid Protection Amount. Upon the consummation of an Alternative Transaction or if this Agreement is terminated not as a result of a breach by Buyer, then Seller shall promptly pay to Buyer the Bid Protection Amount.  Seller shall pay the Bid Protection Amount by wire transfer of immediately available funds.   Seller acknowledges that the bid protections set forth in this Agreement are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, Buyer would not enter into this Agreement.

## ARTICLE VII.

## COVENANTS OF BUYER

**7.1**     Consents and Approvals.

(a)     Buyer shall make, as reasonably requested by Seller, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Buyer or any of its Affiliates pursuant to any applicable law, statute, regulation, ruling, or Order in connection with this Agreement and the transactions contemplated hereby.

(b)     Buyer shall give any other notices to, make any other filings with, and use commercially reasonable efforts to obtain any other authorizations, consents and approvals of, any Governmental Authority in connection with the matters contemplated by this Agreement.

**7.2**     Assumed Obligations. Subsequent to the Closing, Buyer agrees to be responsible for the payment and performance of the Assumed Obligations and shall indemnify and hold Seller harmless with respect to the Assumed Obligations, including, without limitation, any loss,

Liability, cost or expense (including without limitation, legal fees and court costs) arising out of or in connection with, or otherwise relating to, the Assumed Obligations.

7.3    <u>Commercially Reasonable Efforts</u>. Buyer shall use its commercially reasonable efforts to take or cause to be taken all action and do or cause to be done all things necessary, proper or advisable in Buyer's sole discretion to consummate the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, Buyer shall execute such documents and take such further actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby.

7.4    <u>Future Performance</u>. Buyer shall be responsible for providing adequate assurance of future performance, within the meaning of Section 365(b) of the Bankruptcy Code, with respect to the Assumed Executory Contracts.

**ARTICLE VIII.**

**<u>CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER</u>**

The obligations of Buyer under this Agreement are subject to the satisfaction or, at Buyer's option, waiver of the following conditions precedent on or before the Closing Date.

8.1    <u>Representations and Warranties; Covenants</u>.

(a)    All representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing Date as if made again on and as of such date; <u>provided</u>, <u>however</u>, that (i) any such representation or warranty qualified by a reference to materiality or Material Adverse Effect or similar qualifier shall be true and correct in all respects after giving effect to any such qualification and (ii) any representation and warranty that is made as of a specific date need only be true and correct as of such specified date.

(b)    Seller shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

8.2    <u>Bankruptcy Conditions</u>.

(a)    The Sale Order shall have been entered on the docket by the Clerk of the Bankruptcy Court and shall not be subject to a stay pending appeal.

(b)    The Sale Order shall approve and authorize the assumption and assignment of the Assumed Executory Contracts.

8.3    <u>Leases</u>. (a) Buyer and the landlord (the "***Landlord***") of the Operating Location located at 10 Skyward Lane, Saratoga Springs, New York, shall have entered into a lease agreement for 5,000 square feet of office space on terms satisfactory to Buyer in its sole discretion (the "***Saratoga Lease***") and (b) Buyer shall have entered into a new lease for warehouse space (the "***Warehouse Lease***") on term satisfactory to Buyer in its sole discretion.

22

**8.4**     Employees.  Buyer shall have entered into employment arrangements with each of Ken Horan and Steve Horan upon terms satisfactory to Buyer in its sole and exclusive discretion.

**8.5**     Litigation. No action, suit or other proceedings shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement.

**8.6**     Closing Deliveries. Seller shall have delivered to Buyer (a) a certificate signed by Seller, dated the date of the Closing certifying that the conditions specified in **Section 8.1** have been satisfied as of the Closing; (b) certified copies of the resolutions of Seller's boards of directors authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby; (c) originals (or, to the extent originals are not available, copies) of all Assumed Executory Contracts (together with all amendments, supplements or modifications thereto); (d) an assumption agreement with respect to the Assumed Obligations substantially in the form attached hereto as **Exhibit D** (the "*Assumption Agreement*"), duly executed by Seller; (e) a bill of sale related to the Acquired Assets substantially in the form attached hereto as **Exhibit E** (the "*Bill of Sale*"), duly executed by Seller; (f) an assignment of trademarks, substantially in the form attached hereto as **Exhibit F** (the "*Assignment of Trademarks*"), duly executed by Seller; (g) an assignment of domain names substantially in the form attached hereto as **Exhibit G** (the "*Assignment of Domain Names*"), duly executed by Seller; (h) the Saratoga Lease, duly executed by the Landlord; and (i) all other instruments, documents and agreements reasonably requested by Buyer in connection with the transactions contemplated hereby.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller under this Agreement are subject to the satisfaction or, at Seller's option, waiver of the following conditions precedent on or before the Closing Date.

**9.1**     Representations and Warranties; Covenants.

(a)     All representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing Date as if made again on and as of such date; provided, however, that (i) any such representation or warranty qualified by a reference to materiality or material adverse effect or similar qualifier shall be true and correct in all respects after giving effect to any such qualification and (ii) any representation and warranty that is made as of a specific date need only be true and correct as of such specified date.

(b)     Buyer shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

**9.2**     Sale Order. The Sale Order shall have been entered on the docket by the Clerk of the Bankruptcy Court and shall not be subject to a stay pending appeal.

**9.3**    Litigation. No Action shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement.

**9.4**    Consideration. Buyer shall have delivered Seller the Purchase Price.

**9.5**    Deliveries at the Closing. Buyer shall have delivered to Seller (a) a certificate signed by Buyer, dated the date of the Closing certifying that the conditions specified in **Section 9.1** have been satisfied as of the Closing; (b) the Assumption Agreement duly executed by Buyer; (c) the Bill of Sale duly executed by Buyer; (d) the Assignment of Trademarks duly executed by Buyer; (e) the Assignment of Domain Names duly executed by Buyer and (f) all other instruments and agreements reasonably requested by Seller in connection with the transactions contemplated hereby.

## ARTICLE X.

## CLOSING

**10.1**    Closing. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "***Closing***") will take place via the electronic exchange of signature pages no later than the third Business Day after the date on which the conditions set forth in **ARTICLE VIII** and **ARTICLE IX** have been satisfied or waived; or on such other date or in such other manner as Buyer and Seller may mutually determine (the "***Closing Date***").

**10.2**    Deliveries by Seller. At the Closing, Seller shall deliver or procure delivery to Buyer of:

(a)    physical possession of all of the Acquired Assets capable of passing by delivery with the intent that title in such Acquired Assets shall pass by and upon delivery;

(b)    the Bill of Sale duly executed by Seller;

(c)    the Assumption Agreement duly executed by Seller;

(d)    the Assignment of Trademarks duly executed by Seller;

(e)    the Assignment of Domain Names duly executed by Seller;

(f)    the Saratoga lease, duly executed by the Landlord;

(g)    a certificate from Seller that complies with Section 1445 of the Code, duly executed and acknowledged, certifying that the transactions contemplated hereby are exempt from withholding pursuant to the provisions of the Foreign Investors Real Property Tax Act and specifying therein the facts supporting the exemption;

(h)    Seller's portion of such prorations to be paid to Buyer as described in the last sentence of **Section 3.2**; and

24

(i)     all the Books and Records.

**10.3**    <u>Deliveries by Buyer</u>. At the Closing, Buyer will deliver to Seller:

(a)     the Bill of Sale duly executed by Buyer;

(b)     the Assumption Agreement duly executed by Buyer;

(c)     the Assignment of Trademarks duly executed by Buyer;

(d)     confirmation that Buyer has entered into the Warehouse Lease;

(e)     the Assignment of Domain Names duly executed by Buyer; and

(f)     the Purchase Price by wire transfer of immediately available funds to an account designed in writing by Seller.

**10.4**    <u>Form of Instruments</u>. To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Buyer and Seller.

## ARTICLE XI.

## **TERMINATION**

**11.1**    <u>Termination</u>. This Agreement may be terminated prior to the Closing as follows:

(a)     by mutual written agreement of Buyer and Seller;

(b)     by either Buyer or Seller if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c)     by either Buyer or Seller (<u>provided</u> that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or material misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the other party, which breach is not cured within ten days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to the Closing;

(d)     by Buyer or Seller on any day on or after 30 days following the date of entry of the Sale Order if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Buyer and Seller in writing), unless the Closing has not occurred due to a material failure of such party to perform or observe its agreements or covenants as set forth in this Agreement required to be performed or observed by it on or before the Closing Date; or

(e)     Upon consummation of an Alternative Transaction.

**11.2**   Effect of Termination or Breach.  If the transactions contemplated hereby are not consummated this Agreement shall become null and void and of no further force and effect, except (a) for this **Section 11.2**, (b) for the provisions of **Sections 13.1**, **13.6**, **13.7**, **13.8**, **13.9**, **13.13**, **13.18** and **13.19** hereof, and (c) that the termination of this Agreement for any cause shall not relieve any party hereto from any Liability which at the time of termination had already accrued to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination.   Notwithstanding anything to the contrary contained in this Agreement, a termination of this Agreement shall not limit Buyer's right to receive the Bid Protection Amount.

## ARTICLE XII.

## ADDITIONAL POST-CLOSING COVENANTS

**12.1**   Employees.

(a)   No later than the first Business Day prior to the Closing Date, the employment of all of the employees of Seller shall be terminated by Seller, and all such employees shall have the right to apply for employment with Buyer. Seller recognizes that Buyer intends to make offers of employment to certain employees of Seller, on terms and conditions of employment that may be different from those provided by Seller, and that it is uncertain how many employees of Seller will accept employment with Buyer. Each such employee of Seller who accepts such offer of employment by Buyer commencing immediately after the Closing is referred to herein as a "***Rehired Employee***". The number of offers of employment made by Buyer, and the terms and conditions of such offers, shall be determined by Buyer in its sole discretion and in accordance with applicable law. Seller shall be responsible for any and all wages, bonuses, commissions, employee benefits, retention or stay bonus arrangements, and other compensation (including all obligations under Seller Employee Benefit Plans) due to the employees of Seller arising out of their employment with Seller prior to the Closing.

(b)   Nothing contained in this Agreement shall confer upon any Rehired Employee any right with respect to continuance of employment by Buyer, nor shall anything herein interfere with the right of Buyer to terminate the employment of any Rehired Employees at any time, with or without notice, or restrict Buyer, in the exercise of its business judgment in modifying any of the terms or conditions of employment of any Rehired Employees after the Closing.

**12.2**   Employee Benefit Plans. Buyer shall not assume any Seller Employee Benefit Plans or any obligation or Liability thereunder and Buyer shall provide benefits to those Rehired Employees as of or after the Closing as Buyer, in its sole discretion, shall determine.

**12.3**   Seller's Cooperation in Hiring of Employees. Seller shall cooperate with Buyer and shall permit Buyer a reasonable period prior to the Closing Date (a) to meet with employees of Seller (including managers and supervisors) at such times during normal business hours as Buyer shall reasonably request, (b) to speak with such employees' managers and supervisors (in each case with appropriate authorizations and releases from such employees) who are being considered for employment by Buyer, (c) to distribute to such employees of Seller such forms and other

26

documents relating to potential employment by Buyer after the Closing as Buyer may reasonably request, and (d) subject to applicable law, to permit Buyer's counsel, upon reasonable request, to review personnel files and other relevant employment information regarding employees of Seller.

**12.4**    <u>WARN Act</u>. In respect of notices and payments relating to events occurring on or prior to the Closing, Seller shall be responsible for (and Seller shall indemnify and hold Buyer harmless from and against) any and all notices, payments, fines or assessments due to any Governmental Authority, pursuant to any applicable federal, state or local law, common law, statute, rule, regulation or ordinance with respect to the employment, discharge or layoff of employees by Seller before the Closing, including but not limited to the Worker Adjustment and Retraining Notification Act and any rules or regulations as have been issued in connection with the foregoing (jointly, referred to throughout this Agreement as the "***WARN Act***"). Likewise, in respect of notices and payments relating to events occurring after the Closing, Buyer shall be responsible and assume (and shall indemnify and hold Seller harmless from and against) all Liability for any and all notices, payments, fines or assessments due to any Governmental Authority, pursuant to the WARN Act, with respect to the employment, discharge or layoff of employees employed by Buyer from and after the Closing.

**12.5**    <u>Joint Post-Closing Covenant of Buyer and Seller</u>. Buyer and Seller jointly covenant and agree that, from and after the Closing Date, Buyer and Seller will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (a) the preparation of any Tax Return of Seller or Buyer for all periods prior to or including the Closing Date and (b) any audit of Buyer and/or any audit of Seller with respect to the sales, transfer and similar Taxes imposed by the laws of any state or political subdivision thereof, relating to the transactions contemplated by this Agreement. In furtherance hereof, Buyer and Seller further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith. All costs and expenses incurred in connection with this **<u>Section 12.5</u>** referred to herein shall be borne by the party who is subject to such action.

**12.6**    <u>Name Changes</u>. Seller understands that, subsequent to the Closing, Buyer may use the names "SKS Bottle and Packaging" and that such name is included in the Acquired Assets hereunder. Within twenty (20) Business Days following the Closing, Seller shall change its name from "SKS Bottle and Packaging" to a name that is not confusingly similar thereto, and from and after ten (10) Business Days after the Closing, Seller shall not use, directly or indirectly, the name "SKS Bottle and Packaging" or any other name that is confusingly similar thereto.

**12.7**    <u>Accounts Receivable/Collections</u>. After the Closing, Seller shall permit, and hereby authorizes, Buyer to collect, in the name of Seller, all Accounts Receivable and to endorse with the name of Seller for deposit in Buyer's account any checks or drafts received in payment thereof. Seller shall promptly deliver to Buyer any cash, checks or other property that they may receive after the Closing in respect of any Accounts Receivable or other asset constituting part of the Acquired Assets.

**12.8**    <u>Access to Information</u>. For a period of twelve (12) months after the Closing Date (the "***Transition Period***"), the parties and their representatives shall have reasonable access to, and

18335334.9

each shall have the right to photocopy, all of the books and records relating to the Acquired Assets, including all employee records or other personnel and medical records required by law, legal process or subpoena, in the possession of the other party to the extent that such access may reasonably be required by such party in connection with the Assumed Obligations or the Unassumed Liabilities, or other matters relating to or affected by the operation of the Acquired Assets. Such access shall be afforded by the party in possession of such books and records upon receipt of reasonable advance notice and during normal business hours; provided, however, that (a) any such investigation shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party or its Affiliates, (b) no party shall be required to take any action which would constitute a waiver of the attorney-client privilege and (c) no party need supply the other party with any information which such party is under a legal obligation not to supply. The party exercising this right of access shall be solely responsible for any costs or expenses incurred by it pursuant to this **Section 12.8**. If the party in possession of such books and records shall desire to dispose of any such books and records upon or prior to the expiration of such period, such party shall, prior to such disposition, give the other party a reasonable opportunity at such other party's expense, to segregate and remove such books and records as such other party may select.

## ARTICLE XIII.

## MISCELLANEOUS

**13.1**    Expenses.

(a)    Except as otherwise provided in this Agreement and except for the Bid Protection Amount, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby.

(b)    The parties hereto agree that if any Claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or Seller in connection with this transaction, all such Claims shall be handled and paid by the party whose actions form the basis of such Claim and such party shall indemnify and hold the other harmless from and against any and all such Claims or demands asserted by any Person, firm or corporation in connection with the transaction contemplated hereby.

**13.2**    Amendment and Waiver. This Agreement may not be amended or the observance of any term of this Agreement waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely) without the prior written consent of both Seller and Buyer or, in the case of a waiver, by the party waiving compliance. Any agreement on the part of a party to any extension or waiver shall only be valid if set forth in an instrument in writing signed on behalf of such party. Any such waiver or extension shall not operate as waiver or extension of any other condition or obligation.

**13.3**    Notices. Any notice or demand hereunder to or upon any party hereto required or permitted to be given or made shall be deemed to have been duly given or made for all purposes if (a) in writing and sent by (i) messenger or an overnight courier service against receipt, or (ii)

certified or registered mail, postage paid, return receipt requested, or (b) sent by facsimile or similar electronic means, provided that a written copy thereof is sent on the same day by postage paid first-class mail, to such party at the following address:

| | |
|---|---|
| To Seller: | SKS Bottle and Packaging, Inc.<br>10 Skyward Drrive<br>Saratoga Springs, NY 12866<br>Attention: Ken Horan<br>E-mail: Kendo22@sks-bottle.com |
| with copy to: | Whiteman Osterman & Hanna LLP<br>80 State Street, 11th Floor<br>Albany, NY 12207<br>Attention:  Justin A. Heller, Esq.<br>E-mail: jheller@woh.com |
| To Buyer: | Pipeline Packaging Corporation<br>100 Executive Parkway<br>Hudson, OH  44236<br>Attention:  Christopher I. Nelson, President and CEO<br>E-mail:  cnelson@cscpails.com |
| with copy to: | Hahn Loeser & Parks LLP<br>200 Public Square, Suite 2800<br>Cleveland, OH  44114<br>Attention:  John Paul Lucci, Esq.<br>E-mail:  jlucci@hahnlaw.com |

or such other address as either party hereto may at any time, or from time to time, direct by notice given to the other party in accordance with this Section. The date of giving or making of any such notice or demand shall be: in the case of clause (a)(i), the date of receipt; in the case of clause (a)(ii), five (5) Business Days after such notice or demand is sent; and, in the case of clause (b), the date of receipt if prior to 5:00 p.m. local time, otherwise the business day next following the date such notice or demand is sent.

**13.4**    Counterparts and Execution.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method, and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

29

**13.5**    Headings. The headings preceding the text of the Articles and Sections of this Agreement and the Schedules are for convenience only and shall not be deemed part of this Agreement.

**13.6**    SUBMISSION TO JURISDICTION. FOR SO LONG AS SELLER IS SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.

**13.7**    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (regardless of the laws that might otherwise govern under applicable New York principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies, except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.

**13.8**    Binding Nature; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed); except (a) that Buyer may assign without such consent any or all of its rights and obligations hereunder to any Affiliate or Subsidiary of Buyer (whether wholly owned or otherwise) or to its lender and, following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Acquired Assets (provided, however, that such assignment shall not relieve Buyer of any of its obligations hereunder); (b) the rights and interests of Seller hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code; (c) this Agreement may be assigned to any entity appointed as a successor to Seller pursuant to a confirmed Chapter 11 plan; or (d) as otherwise provided in this Agreement. Seller hereby agrees that Buyer may grant a security interest in its rights and interests hereunder to its lenders and that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code.

**13.9**    No Third Party Beneficiaries. This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, Claims, or causes of action under or by reason of this Agreement.

**13.10**    Tax Matters.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid by Buyer and Buyer shall indemnify, defend (with counsel reasonably satisfactory to Seller), protect, and save

30

and hold Seller harmless from and against any and all Claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes.

(b)    Buyer shall, prior to the later of (i) 120 days after the Closing Date or (ii) 30 days prior to the date by which Seller's federal income Tax Return that covers the period in which the Closing occurs must be filed (not including an extension), prepare and deliver to Seller for its consent (which consent shall not be unreasonably withheld, delayed or conditioned) a schedule allocating the Purchase Price (and any other items that are required for federal income tax to be treated as Purchase Price) among the Assumed Executory Contracts and the Acquired Assets (such schedule, the "***Allocation***"). If Seller raises any objection to the Allocation, Buyer and Seller will negotiate in good faith to resolve such objection(s). Buyer and Seller shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally agreed upon and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Authority or any other proceeding). Buyer and Seller shall cooperate in the timely filing of any forms (including Form 8594 under section 1060 of the Code) with respect to such Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price. If and to the extent the parties are unable to agree on such Allocation, the parties shall retain the Accounting Firm to resolve such dispute. Notwithstanding any other provision of this Agreement, the terms and provisions of this **Section 13.10(b)** shall survive the Closing without limitation.

**13.11**    Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

**13.12**    Public Announcements. Except as required by law or in connection with the Chapter 11 Case, neither Seller nor Buyer shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party(ies) hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned. Prior to making any public disclosure required by applicable law or the Chapter 11 Case, the disclosing parties shall give the other party a copy of the proposed disclosure and reasonable opportunity to comment on the same.

**13.13**    Entire Understanding. This Agreement, the Exhibits and the Schedules set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement, the Exhibits and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

**13.14**    Closing Actions. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

**13.15**  Conflict. The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document executed in connection herewith, this Agreement shall govern and control.

**13.16**  No Survival. The representations and warranties of Seller and Buyer contained in this Agreement or in any instrument delivered in connection herewith shall not survive the Closing and thus no claim for any breach thereof may be asserted after the Closing Date under any circumstances. Notwithstanding the survival of any covenants contained herein, nothing contained herein shall in any manner prevent the winding down and liquidation of Seller's operations.

**13.17**  Bankruptcy Court Approval/Sale Order. Seller's obligations under this Agreement are subject to the approval of the Bankruptcy Court and the terms and conditions of the Sale Order and the terms and conditions of this Agreement shall not be binding on Seller to the extent they do not comply with the terms and conditions of the Sale Order and unless and until they are approved by the Bankruptcy Court.

**13.18**  Confidentiality. Each party hereto agrees that it will, and will advise its officers, directors, equityholders, attorneys, accountants, consultants and agents of the necessity to, keep confidential all non-public information concerning the other which it has learned in connection with the transactions contemplated by this Agreement.

**13.19**  Unenforceability, Severability. If any provision of this Agreement is found to be void or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall nevertheless be binding upon the parties with the same force and effect as though the unenforceable part had been severed and deleted.

**13.20**  Specific Performance. The parties hereto agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms or otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.

18335334.9

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered as of the date first above written.

**BUYER:**

**PIPELINE PACKAGING CORPORATION**

By: _____
      Name:  Christopher L. Nelson
      Title:   President and CEO

**SELLER:**

**SKS BOTTLE AND PACKAGING, INC.**

By: _____
      Name:  Ken Horan
      Title:   President

[Signature page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered as of the date first above written.

**BUYER:**

**PIPELINE PACKAGING CORPORATION**

By: _Christopher L. Nelson_
    Name:  Christopher L. Nelson
    Title:  President and CEO

**SELLER:**

**SKS BOTTLE AND PACKAGING, INC.**

By: _____
    Name:  Ken Horan
    Title:  President

[Signature page to Asset Purchase Agreement]

## **Exhibit A**

Form of Bidding Procedures

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | |
| | Chapter 11 |
| SKS Bottle and Packaging, Inc., | Case No. 24-11283 |
| Debtor. | |

## **BIDDING PROCEDURES**

By motion dated February 12, 2025 (the "Motion"), SKS Bottle and Packaging, Inc., the above-captioned debtor and debtor in possession ("SKS" or, the "Debtor") sought approval of, among other things, the procedures by which the Debtor will determine the highest or otherwise best offer for the sale of substantially all of the Debtor's assets (the "Acquired Assets").

On February __, 2025, the Court entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtor to determine the highest or otherwise best offer for the Acquired Assets through the process and procedures set forth below (the "Bidding Procedures"). The Debtor reserves the right to modify the Bidding Procedures, provided that any such modification is not materially inconsistent with the terms of the Bidding Procedures Order.

The sale of the Acquired Assets will be subject to competitive bidding as set forth herein and approval of the Court pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

### Assets to be Sold

The Acquired Assets to be sold constitute substantially all of the assets of the Debtor.

### Participation Requirements

In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in the Acquired Assets (a "Bidder") must first deliver the following materials to the Debtor and its counsel:

i.        an executed confidentiality agreement in form and substance satisfactory to the Debtor and its counsel; and

ii.        the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Bidder, or, if the Bidder is an entity formed for the purpose of a sale transaction, (x) Financials of the equity holder(s) of the Bidder and (y) a written commitment acceptable to the Debtor of the equity holder(s) of the Bidder to be responsible for the Bidder's obligations in connection with a sale transaction (including being bound by the terms and conditions of the Bidding Procedures); which demonstrate to the Debtor's reasonable satisfaction the Bidder's financial ability to consummate a competing sale transaction provided that if a Bidder is unable to provide Financials, the Debtor may in its discretion, but shall have no obligation to, accept such other information as they deem sufficient to establish a Bidder's financial wherewithal.

A Bidder meeting the requirements set forth in this paragraph shall be considered a "Qualified Bidder." Notwithstanding the foregoing, Pipeline Packaging Corporation ("Pipeline" or the "Stalking Horse Purchaser") shall be a Qualified Bidder.

<u>Bid Requirements</u>

The Debtor shall determine whether a bid qualifies as a "Qualified Bid." To constitute a Qualified Bid, a bid (other than the Stalking Horse APA, which shall constitute a Qualified Bid) must be a written irrevocable offer from a Qualified Bidder and meet the following conditions, unless waived by the Debtor:

    i.     contain a proposed asset purchase agreement, executed by and binding upon the Bidder, reflecting the terms and conditions of the bid (each, a "Proposed Asset Purchase Agreement").  Such Proposed Asset Purchase Agreement should also:

    a.    contain terms that are substantially similar to, and not materially more burdensome or conditional than, the terms of the Stalking Horse APA (unless the Debtor determines any proposed alternative terms are superior to the terms and conditions of the Agreement), and such Bidder must also include a marked copy of its Proposed Asset Purchase Agreement showing any changes, amendments or modifications to the Stalking Horse APA that are being proposed by the Bidder, as applicable (each, a "Marked Asset Purchase Agreement"); and

    b.    provide that the consideration to be given will exceed the Purchase Price (as defined in the Stalking Horse APA), by at least $175,000.00 (the "Initial Minimum Overbid").

    ii.    contain a list of the Debtor's executory contracts and unexpired leases (if any) with respect to which the Bidder seeks assignment from the Debtor, provided, however, if any bid is conditioned on the assumption and assignment of executory contracts and/or unexpired leases, the Bidder shall be required to provide evidence of its ability to provide adequate assurance of future performance of such contracts or leases along with its bid;

    iii.    confirm that the Bidder's offer shall remain open and irrevocable as provided below;

    iv.    be submitted no later than the Bid Deadline (defined below) and accompanied by a certified or bank check or wire transfer in an amount equal to ten percent (10%) of the proposed purchase price set forth in the Proposed Asset Purchase Agreement as a minimum

good faith deposit (the "Deposit"), which Deposit shall be used to fund a portion of the

purchase price provided for in the bid;

v.      not be conditioned on obtaining financing or the outcome of any due diligence by

the Bidder;

vi.      not request or entitle the Bidder to any break-up fee, expense reimbursement or

similar type of payment; and

vii.      fully disclose the identity of each entity that will be bidding for the Acquired Assets

or otherwise participating in connection with such bid, and the complete terms of any such

participation.

<u>Bid Deadline</u>

The deadline for submitting bids on the Acquired Assets shall be 12:00 noon (prevailing

Eastern time) on March 5, 2025 (the "Bid Deadline").

A Bidder that desires to make a bid for the Acquired Assets must deliver written and

electronic copies of their bid so that they are actually received prior to the Bid Deadline by: (a)

counsel to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New

York, 12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.; (b) counsel to GMES,

Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich,

Esq. and Brian Roy, Esq.; (c) the Office of the United States Trustee for the Northern District of

New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; and

(d) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square, Suite

2800, Cleveland, Ohio 44114, Attn: John Paul Lucci, Esq. (jlucci@hahnlaw.com).

As promptly as practicable after a Bidder delivers a bid, the Debtor shall determine, and

shall notify the Bidder, whether the Bidder is a Qualified Bidder and whether its bid is a Qualified

Bid. The Debtor may modify, employ and announce at the Auction additional or amended procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules (i) are not materially inconsistent with the Bidding Procedures Order and (ii) are disclosed to each Qualified Bidder attending the Auction.

### Obtaining Due Diligence Access

The Debtor shall afford each Qualified Bidder reasonable due diligence information. Site access shall be provided upon reasonable request to the Debtor and at the discretion of the Debtor within its reasonable business judgment. The due diligence period will end on the Bid Deadline. The Debtor shall not be obligated to furnish any information relating to the Debtor, the Acquired Assets, and/or the sale to any person except to a Qualified Bidder. The Debtor shall give each Qualified Bidder reasonable access to an online data room containing the written due diligence materials provided to the Stalking Horse Purchaser.

The Debtor shall coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

### Due Diligence from Bidders

Each Bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors, including requests for additional information regarding such Bidder's financial wherewithal to consummate and perform obligations in connection with the sale of the Acquired Assets or such other matters as may be subject to reasonable inquiry by the Debtor. Failure by the Bidder to comply with requests for additional information may be a basis for the Debtor to determine that a bid made by the Bidder is not a Qualified Bid.

### "As Is, Where Is, With All Faults"

The sale of the Acquired Assets shall be on an "as is, where is, with all faults" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or estate, except to the extent specifically set forth in the purchase agreement between the Debtor and the Successful Bidder. All of the Debtor's right, title and interest in and to the Acquired Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests") except as otherwise set forth in the Successful Bid(s) submitted by the Successful Bidder(s), with such Interests to attach to the net proceeds of the sale of the Acquired Assets, with the same validity and priority as existed immediately prior to such sale.

Each Bidder shall be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Acquired Assets prior to making its offer, that such Bidder has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that such Bidder did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets or the completeness of any information provided in connection with the bidding process, in each case except as expressly stated in the Marked Purchase Agreement (or, with respect to the Stalking Horse Purchaser, the Stalking Horse APA).

<u>The Auction</u>

If the Debtor receives two or more competing Qualified Bids for any of the Acquired Assets prior to the Bid Deadline, an auction (the "Auction") for such assets, as applicable, shall take place at 10:00 a.m. (prevailing Eastern time) on March 10, 2025 at the offices of Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, or at such other place and

time as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids. If, however, no such competing Qualified Bids are received by the Bid Deadline, then the Auction will not be held, the Stalking Horse Purchaser shall be deemed the Successful Bidder.

<u>Auction Rules:</u>

i.      Only Qualified Bidders who have submitted a Qualified Bid and their authorized representatives will be eligible to attend and participate in the Auction.  Notwithstanding the foregoing, a representative from the Office of the United States Trustee may also attend the Auction.  Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.  Qualified Bidders and their counsel wishing to participate in the Auction via audio or video conference technology may make arrangements to do so by contacting counsel for the Debtor no later than the Bid Deadline.

ii.      The Debtor may, in its sole discretion, adopt rules for the Auction at any time that the Debtor reasonably determines to be appropriate to promote a value-maximizing auction, including, without limitation, conducting one or more sub-auctions for the Acquired Assets in different subsets or lots.

iii.      At the commencement of the Auction the Debtor shall announce the Qualified Bid that it has determined represents the highest or otherwise best bid for the Acquired Assets (the "Starting Qualified Bid"), the overall consideration value ascribed to such bid (the "Bid Value") and any other distinguishing features which, in the opinion of the Debtor, makes the Starting Qualified Bid the highest or otherwise best offer for the Acquired Assets.

iv.      Each Qualified Bidder present at the Auction will be permitted to increase its Qualified Bid (such increased Qualified Bid, a "Qualified Overbid"), provided that such Qualified Overbid(s) must exceed the Bid Value of the Starting Qualified Bid or, if applicable, the highest or

otherwise best Qualified Overbid, by an incremental amount that is not less than an amount to be announced at or before the commencement of any Auction (the "Bidding Increment"). The Debtor reserves the right to determine an appropriate Bidding Increment for each subset or lot of Acquired Assets to be sold at the Auction. Notwithstanding the foregoing, the initial Bidding Increment for any Qualified Bids with respect to the Acquired Assets shall be at least fifty thousand dollars ($50,000.00), however the Debtor, in its business judgment, may select a different Bidding Increment for the Acquired Assets during the Auction.  During the course of the Auction, the Debtor will inform the participants which Qualified Overbid reflects the then-highest or otherwise best offer for the applicable Acquired Assets and the Bid Value ascribed thereto. The Debtor shall not consider any subsequent bid received at the Auction unless the Bid Value of such bid, as determined by the Debtor, exceeds the Bid Value of the Starting Qualified Bid or the then-highest Qualified Overbid by at least the applicable Bidding Increment.

v.      The Auction may be adjourned as the Debtor deems appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all Qualified Bidders that have submitted a Qualified Bid.

vi.      At the conclusion of the Auction, the Debtor shall announce the bid made pursuant to the Bidding Procedures that represents, in the Debtor's judgment, the highest or otherwise best offer for the Acquired Assets (the "Successful Bid") and the Bidder or Bidders submitting such bid (the "Successful Bidder(s)"). The Debtor may also, in its discretion, announce the next-highest or otherwise best offer or offers for any subset of the Acquired Assets (each, a "Back-Up Bid") and the party or parties submitting such bid or bids (the "Back-Up Bidder(s)"). If an Auction is held, the Debtor shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared a Successful Bid (or a Back-Up Bid) at the Auction, (ii) definitive documentation has been executed

in respect thereof, and (iii) the Court has approved the sale to a Successful Bidder (or Back-Up

Bidder). Any acceptance by the Debtor is conditioned upon approval by the Court of the Successful

Bid(s) (or Back-Up Bid(s)) and the entry of an order approving such Successful Bid(s) (or Back-

Up Bid(s)).

<u>Other Terms</u>

All Qualified Bids, the Auction, and the Bidding Procedures are subject to such additional

terms and conditions as may be announced by the Debtor from time to time, provided that such

additional terms and conditions are not materially inconsistent with the Bidding Procedures Order.

<u>Irrevocability of Certain Bids</u>

Any Successful Bid(s) shall remain irrevocable in accordance with the terms of the

Proposed Asset Purchase Agreement submitted by the Successful Bidder(s), as the same may be

modified at the Auction. Back-Up Bid(s), as modified at the Auction, shall be irrevocable until the

earliest of: (i) 45 days after entry of the Sale Order approving a Successful Bid for the same

Acquired Assets; (ii) closing of the sale of the same Acquired Assets to the Successful Bidder; and

(iii) such date as the Debtor affirms in writing that the Debtor does not intend to proceed with a

sale to the Back-Up Bidder (the "Outside Back-Up Date"). Following the entry of the Sale Order,

if a Successful Bidder fails to consummate the purchase of the Acquired Assets subject to its

Successful Bid because of a breach or failure to perform on the part of the Successful Bidder, the

applicable Back-Up Bid (if any) will be deemed to be the new Successful Bid, and the Debtor will

be authorized, but not required, to consummate the sale with the Back-Up Bidder without further

order of the Court. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to

the Debtor and the Debtor shall have the right to seek any and all other remedies and damages

from the defaulting Successful Bidder. For the avoidance of doubt, if the defaulting Successful

Bidder is the Stalking Horse Purchaser, the Stalking Horse Purchaser shall not be entitled to the Bid Protection Amount.

The Debtor will present the results of the Auction to the Court at the Sale Hearing (as defined below), at which time certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (i) the Auction was conducted and the Successful Bidder(s) were selected in accordance with these Bidding Procedures, (ii) the Auction was fair in substance and procedure, (iii) the Successful Bidder and any Back-Up Bidders are good faith buyers; and (iv) consummation of the sale contemplated by the Successful Bid(s) will provide the highest or otherwise best value for the Acquired Assets and is in the best interests of the Debtor and its creditors.

## Sale Hearing

A hearing to consider approval of the sale of the Acquired Assets to the Successful Bidder (the "Sale Hearing") will be held before the Honorable Robert E. Littlefield, Jr., United States Bankruptcy Judge, or such other judge as may be sitting in his stead at the United States Bankruptcy Court for the Northern District of New York, 445 Broadway, Suite 330, Albany, NY 12207, the hearing may also be accessed telephonically by dialing 518-217-2288; and Conference ID: 939500229#, on March 12, 2025 at 10:30 a.m. (prevailing Eastern time), or at such other time thereafter as counsel may be heard. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

## Return of Deposit

Except as otherwise provided in this paragraph with respect to any Successful Bid and any Back-Up Bid, the Deposits of all Qualified Bidders that submitted such a deposit under the Bidding

Procedures shall be returned upon or within three (3) business days after the date on which the Court enters an order approving the sale of the Acquired Assets to the Successful Bidder(s) or otherwise concludes the Sale Hearing without adjournment. The Deposit of the Successful Bidder(s) shall be held until the closing of the sale of the Acquired Assets and applied in accordance with the Successful Bid(s) or returned in accordance with the Successful Bidder's purchase agreement. The Deposit of the Back-Up Bidder(s) shall be returned upon or within five business (5) days after the Outside Back-Up Date.

<u>Failure to Close</u>

If a Successful Bidder fails to consummate the transaction in accordance with the terms of the purchase agreement executed by the Successful Bidder by the closing date contemplated in the purchase agreement agreed to by the parties for any reason (except in the case of the Stalking Horse Purchaser, in which case the termination provisions in the Stalking Horse APA shall apply to the extent applicable), the Debtor shall: (i) retain the Successful Bidder's Deposit; (ii) maintain the right to pursue all available remedies, whether legal or equitable; and (iii) be free to consummate the proposed transaction with the applicable Back-Up Bidder at the highest price bid by the Back-Up Bidder at the Auction, without the need for an additional hearing or order of the Court.

<u>Reservation of Rights</u>

Except as otherwise provided in the Bidding Procedures Order, the Debtor reserves the right to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or best proposal; (iv) reject any bid that the Debtor deems to be (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the

requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtor and its

estate; (v) remove some of the Acquired Assets from the Auction or offer the Acquired Assets in

different subsets or lots; (vi) waive terms and conditions set forth herein with respect to all Bidders;

(vii) impose additional terms and conditions with respect to all Bidders; (viii) extend the deadlines

set forth herein; (ix) adjourn or cancel the Auction and/or Sale Hearing in open court without

further notice; and (x) modify the Bidding Procedures, as the Debtor may determine to be in the

best interests of its estate, or to withdraw the Motion and abandon the sale process at any time with

or without prejudice.

<u>Expenses</u>

Except to the extent the Stalking Horse Purchaser is entitled to a Bid Protection Amount as

approved by the Court, any Bidders presenting bids shall bear their own expenses in connection

with the proposed sale of the Acquired Assets, whether or not such sale is ultimately approved.

\* \* \*

## **Exhibit B**

Form of Bidding Procedures Order

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | |
| | Chapter 11 |
| SKS Bottle and Packaging, Inc., | Case No. 24-11283 |
| Debtor. | |

**ORDER: (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (II) SCHEDULING AN AUCTION AND HEARING TO CONSIDER AND APPROVE THE SALE, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (IV) APPROVING THE STALKING HORSE APA**

Upon consideration of the motion (the "Motion") [Docket No. ___] filed by SKS Bottle and Packaging, Inc., the above-captioned debtor and debtor in possession ("SKS" or, the "Debtor"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), as supplemented by Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (this "Bidding Procedures Order"): (i) approving bidding procedures in connection with the sale of substantially all of the Debtor's assets; (ii) scheduling an auction and a hearing to consider the sale; (iii) approving the form and manner of notice thereof; (iv) approving the terms of the Stalking Horse APA and the proposed Bid Protection Amount; and (v) granting related relief; the Court having determined that the relief provided herein is in the best interests of the Debtor, its estate,

creditors, and other parties in interest; and due and adequate notice of the Motion having been given under the circumstances; and upon the record of the hearing on the Motion held on February __, 2025, and the full record of this case; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**

A.  This Court has jurisdiction over the Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.  Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein with respect to the Auction and Sale Hearing. A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties-in-interest.

C.  The Debtor's proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction (as defined in the Bidding Procedures), the sale of the Acquired Assets, and the Bidding Procedures to be employed in connection therewith.

D.  The Debtor has articulated good and sufficient business reasons for this Court to approve the Bidding Procedures, including: (i) the scheduling of a Bid Deadline, Auction and Sale Hearing for the sale of the Acquired Assets; and (ii) the establishment of procedures to fix the Cure Amounts to be paid under section 365 of the Bankruptcy Code in connection with any assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases.

E. The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Acquired Assets.

F. The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate, creditors, and other parties-in-interest.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Motion is granted as set forth herein.

2. Except as expressly preserved herein, all objections to the approval of the Bidding Procedures and other relief provided herein that have not been withdrawn, waived or settled, hereby are overruled and denied on the merits.

3. The Bidding Procedures, in substantially the form attached hereto as Schedule 1, are hereby incorporated herein and approved, and shall apply with respect to the sale of the Acquired Assets. The Debtor is authorized to take all actions necessary or appropriate to implement the Bidding Procedures.

4. As further described in the Bidding Procedures, the deadline for submitting bids for the Acquired Assets (the "Bid Deadline") is March 5, 2025 at 12:00 noon (prevailing Eastern time). No bid shall be deemed to be a Qualified Bid (as defined in the Bidding Procedures) or otherwise considered for any purpose unless such bid meets the requirements set forth in the Bidding Procedures.

5. The Debtor may sell the Acquired Assets by conducting an Auction in accordance with the Bidding Procedures. If the Debtor receives two or more competing Qualified Bids for any of the Acquired Assets the Auction shall take place at 10:00 a.m. (prevailing Eastern time) on March 10, 2025 at the offices of Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, or at such other place and time as the Debtor shall

notify all Qualified Bidders who have submitted Qualified Bids. If, however, no such competing Qualified Bids are received by the Bid Deadline, then the Auction will not be held, the Stalking Horse Purchaser shall be deemed the Successful Bidder.

6. Only Qualified Bidders who have submitted a Qualified Bid and their authorized representatives will be eligible to attend and participate at the Auction. Notwithstanding the foregoing, a representative from the Office of the United States Trustee may also attend the Auction. Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale. Qualified Bidders and their counsel wishing to participate in the Auction via audio or video conference technology may make arrangements to do so by contacting counsel for the Debtor no later than the Bid Deadline.

7. The Sale Hearing shall be held before this Court on March 12, 2025 at 10:30 a.m. (prevailing Eastern time), or as soon thereafter as counsel and interested parties may be heard.

8. On or before three (3) business days after entry of this Bidding Procedures Order, or as soon thereafter as such parties can be identified, the Debtor shall cause (i) a notice in substantially the form attached hereto as Schedule 2 (the "Notice of Auction and Sale Hearing"); and (ii) a copy of the Bidding Procedures Order to be sent by first-class mail postage prepaid, to the following: (a) counsel to GMES, Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich, Esq. and Brian Roy, Esq.; (b) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; (c) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square,

Suite 2800, Cleveland, Ohio 44114, Attn: John Paul Lucci, Esq. (jlucci@hahnlaw.com);

(d) all parties that have requested or that are required to receive special notice pursuant to

Bankruptcy Rule 2002; (e) all persons known or reasonably believed to have asserted any

lien, claim, encumbrance, right of first refusal, or other Interest in or upon any of the

Acquired Assets; (f) the non-debtor parties to the Debtor's known Executory Contracts and

Unexpired Leases and any parties who are known to claim interests therein; and (g) all

persons known or reasonably believed to have expressed an interest in acquiring some or

all of the Acquired Assets within the last six months.

9.  On or before three (3) business days after entry of this Bidding Procedures Order, the

Debtor shall (a) serve the Notice of Auction and Sale Hearing on all known creditors of the

Debtor and all other parties in interest entitled to receive notice pursuant to Bankruptcy

Rule 2002(a)(2).

10. On or before five (5) business days after the entry of this Bidding Procedures Order, the

Debtor shall serve by first class mail or hand delivery, a notice of potential assumption,

assignment and/or transfer of the Executory Contracts and Unexpired Leases (substantially

in the form attached hereto as Schedule 3 the "Notice of Assumption and Assignment") on

all non-debtor parties to the Debtor's known Executory Contracts and Unexpired Leases.

The Notice of Assumption and Assignment shall identify the calculation of the cure

amounts that the Debtor believes must be paid to cure all prepetition defaults under the

Executory Contracts and Unexpired Leases (the "Cure Amounts"). In addition, if the

Debtor identifies additional executory contracts or unexpired leases that might be assumed

by the Debtor and assigned to the Successful Bidder which are not set forth in the original

Notice of Assumption and Assignment, the Debtor shall promptly send a supplemental

notice (a "Supplemental Notice of Assumption and Assignment") to the applicable counterparties to such additional executory contracts and unexpired leases.

11. Unless a non-debtor party to an Executory Contract or Unexpired Lease files an objection (the "Cure Amount/Assignment Objection") to (a) their scheduled Cure Amount and/or (b) to the proposed assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease by the later of (i) 4:00 p.m. (prevailing Eastern time) on the date that is five (5) business days prior to the Bid Deadline, or (ii) solely with respect to any Executory Contract or Unexpired Lease which is the subject of a Supplemental Notice of Assumption and Assignment, five (5) days after service of the relevant Supplemental Notice of Assumption and Assignment (such later date, the "Cure/Assignment Objection Deadline") and serves a copy of the Cure Amount/Assignment Objection so as to be received no later than the Cure/Assignment Objection Deadline by: (i) counsel to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.; (ii) counsel to GMES, Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich, Esq. and Brian Roy, Esq.; (iii) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; and (iv) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114, Attn: John Paul Lucci, Esq. (jlucci@hahnlaw.com), then such non-debtor party (A) will be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease and the Debtor shall be entitled to rely solely upon the Cure Amount, and (B) if the Executory Contract or Unexpired Lease

is identified as an Purchased Asset to be acquired by the Successful Bidder(s) and/or Back-Up Bidder(s), the non-debtor party shall be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtor, the Successful Bidder(s) and/or Back-Up Bidder(s) or any other assignee of the relevant Executory Contract or Unexpired Lease that any additional amounts are due or defaults exist, or that conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract or Unexpired Lease. Notwithstanding the foregoing, as provided below, each non-debtor party shall retain the right to object to the assumption, assignment or transfer of its Executory Contract or Unexpired Lease, based solely on the issue of whether the Successful Bidder(s) and/or Back-Up Bidder(s) can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

12. If an objection challenges a Cure Amount, the objection must set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof. Upon receipt of a Cure Amount/Assignment Objection, the Debtor shall be authorized, but not directed, to resolve any Cure Amount/Assignment Objection by mutual agreement with the objecting counterparty to any Executory Contract or Unexpired Lease and any Successful Bidder without further order of the Court. In the event that the Debtor and any objecting party are unable to consensually resolve any Cure Amount/Assignment Objection prior to the Sale Hearing, the Court will resolve any such Cure Amount/Assignment Objection at the Sale Hearing.

13. The Debtor, the Successful Bidder(s) or the Back-Up Bidder(s), as the case may be, are authorized, subject to the terms of the Successful Bid(s) or the Back-Up Bid(s), to exclude

any Executory Contract or Unexpired Lease from the list of Acquired Assets to be sold (i)
no later than the closing of the sale of the Acquired Assets, or, (ii) if the Court determines
at any hearing on a Cure Amount/Assignment Objection that the applicable cure amount
for such contract is greater than the Cure Amount proposed by the Debtor, no later than
five (5) business days following the date of such determination. The non-debtor party or
parties to any such excluded contract or lease will be notified of such exclusion by written
notice mailed within two (2) business days of such determination.

14. As soon as practicable after the conclusion of the Auction for the Acquired Assets, the
Debtor will file on the Court's docket a notice identifying the Successful Bidder(s) and
Back-Up Bidder(s) and the Executory Contracts and Unexpired Leases that have been
identified in such Successful Bid(s) and Back-Up Bid(s) and shall serve such notice on
non- debtor parties to the Executory Contracts and Unexpired Leases by email. The non-
debtor parties to the Executory Contracts and Unexpired Leases shall have until 10:00 a.m.
on the day of the Sale Hearing (the "Adequate Assurance Objection Deadline") to object
to the assumption, assignment and/or transfer of such Executory Contract or Unexpired
Lease solely on the issue of whether any Successful Bidder or Back-Up Bidder can provide
adequate assurance of future performance as required by section 365 of the Bankruptcy
Code.

15. The terms of the Stalking Horse APA are approved, subject to the receipt of higher or better
bids pursuant to these Bidding Procedures and the entry of the Sale Order.  Further, the
Bankruptcy Court Matters provisions of Section 6.6 of the Stalking Horse APA are
approved, including without limitation the Bid Protection and the Bid Protection Amount
set forth in the Stalking Horse APA.

16. Objections to the sale of the Acquired Assets, or the balance of the relief requested in the Motion but not granted in this Bidding Procedures Order must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the United States Bankruptcy Court for the Northern District of New York, on or before 4:00 p.m. (prevailing Eastern time) seven (7) days prior to the Sale Hearing, or such later date and time (prior to the Sale Hearing) as the Debtor may agree; and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern time) on the same day, upon (i) counsel to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.; (ii) counsel to GMES, Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich, Esq. and Brian Roy, Esq.; (iii) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; and (iv) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114, Attn: John Paul Lucci, Esq. (jlucci@hahnlaw.com) All objections must state with specificity the nature of such objection and will be heard by the Court at the Sale Hearing.

17. The Notice of Auction and Sale Hearing and the Notice of Assumption, and Assignment to be issued in connection with the proposed sale of the Acquired Assets, substantially in the forms annexed hereto as Schedule 2 and Schedule 3, respectively, are approved. The proposed manner of service of the Notice of Auction and Sale Hearing and the Notice of Assumption and Assignment are approved.

18. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

19. Except as otherwise provided in this Bidding Procedures Order, the Debtor shall have the right as it may reasonably determine to be in the best interests of its estate, to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any bid that the Debtor deems to be (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtor and its estate; (e) remove some of the Acquired Assets from the Auction; (f) waive terms and conditions set forth in the Bidding Procedures with respect to all Bidders; (g) impose additional terms and conditions with respect to all Bidders; (h) extend the deadlines set forth herein; (i) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) modify the Bidding Procedures as the Debtor may determine to be in the best interests of its estate, or to withdraw the Motion and abandon the sale process at any time with or without prejudice.

20. The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are waived and this Bidding Procedures Order shall be effective immediately upon its entry.

21. This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

# # #

## SCHEDULE 1

**To Bidding Procedures Order**

**[Bidding Procedures]**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re

SKS Bottle and Packaging, Inc.,

Chapter 11
Case No. 24-11283

Debtor.

## **BIDDING PROCEDURES**

By motion dated February 12, 2025 (the "Motion"), SKS Bottle and Packaging, Inc., the above-captioned debtor and debtor in possession ("SKS" or, the "Debtor") sought approval of, among other things, the procedures by which the Debtor will determine the highest or otherwise best offer for the sale of substantially all of the Debtor's assets (the "Acquired Assets").

On February __, 2025, the Court entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtor to determine the highest or otherwise best offer for the Acquired Assets through the process and procedures set forth below (the "Bidding Procedures"). The Debtor reserves the right to modify the Bidding Procedures, provided that any such modification is not materially inconsistent with the terms of the Bidding Procedures Order.

The sale of the Acquired Assets will be subject to competitive bidding as set forth herein and approval of the Court pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

## Assets to be Sold

The Acquired Assets to be sold constitute substantially all of the assets of the Debtor.

## Participation Requirements

In order to participate in the bidding process or otherwise be considered for any purpose hereunder, a person interested in the Acquired Assets (a "Bidder") must first deliver the following materials to the Debtor and its counsel:

    i.    an executed confidentiality agreement in form and substance satisfactory to the Debtor and its counsel; and

    ii.    the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Bidder, or, if the Bidder is an entity formed for the purpose of a sale transaction, (x) Financials of the equity holder(s) of the Bidder and (y) a written commitment acceptable to the Debtor of the equity holder(s) of the Bidder to be responsible for the Bidder's obligations in connection with a sale transaction (including being bound by the terms and conditions of the Bidding Procedures); which demonstrate to the Debtor's reasonable satisfaction the Bidder's financial ability to consummate a competing sale transaction provided that if a Bidder is unable to provide Financials, the Debtor may in its discretion, but shall have no obligation to, accept such other information as they deem sufficient to establish a Bidder's financial wherewithal.

A Bidder meeting the requirements set forth in this paragraph shall be considered a "Qualified Bidder." Notwithstanding the foregoing, Pipeline Packaging Corporation ("Pipeline" or the "Stalking Horse Purchaser") shall be a Qualified Bidder.

<u>Bid Requirements</u>

The Debtor shall determine whether a bid qualifies as a "Qualified Bid." To constitute a Qualified Bid, a bid (other than the Stalking Horse APA, which shall constitute a Qualified Bid) must be a written irrevocable offer from a Qualified Bidder and meet the following conditions, unless waived by the Debtor:

i.      contain a proposed asset purchase agreement, executed by and binding upon the Bidder, reflecting the terms and conditions of the bid (each, a "Proposed Asset Purchase Agreement").  Such Proposed Asset Purchase Agreement should also:

a.   contain terms that are substantially similar to, and not materially more burdensome or conditional than, the terms of the Stalking Horse APA (unless the Debtor determines any proposed alternative terms are superior to the terms and conditions of the Agreement), and such Bidder must also include a marked copy of its Proposed Asset Purchase Agreement showing any changes, amendments or modifications to the Stalking Horse APA that are being proposed by the Bidder, as applicable (each, a "Marked Asset Purchase Agreement"); and

b.   provide that the consideration to be given will exceed the Purchase Price (as defined in the Stalking Horse APA), by at least $175,000.00 (the "Initial Minimum Overbid").

ii.      contain a list of the Debtor's executory contracts and unexpired leases (if any) with respect to which the Bidder seeks assignment from the Debtor, provided, however, if any bid is conditioned on the assumption and assignment of executory contracts and/or unexpired leases, the Bidder shall be required to provide evidence of its ability to provide adequate assurance of future performance of such contracts or leases along with its bid;

iii.      confirm that the Bidder's offer shall remain open and irrevocable as provided below;

iv.      be submitted no later than the Bid Deadline (defined below) and accompanied by a certified or bank check or wire transfer in an amount equal to ten percent (10%) of the proposed purchase price set forth in the Proposed Asset Purchase Agreement as a minimum

good faith deposit (the "Deposit"), which Deposit shall be used to fund a portion of the purchase price provided for in the bid;

v.        not be conditioned on obtaining financing or the outcome of any due diligence by the Bidder;

vi.        not request or entitle the Bidder to any break-up fee, expense reimbursement or similar type of payment; and

vii.        fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

<u>Bid Deadline</u>

The deadline for submitting bids on the Acquired Assets shall be 12:00 noon (prevailing Eastern time) on March 5, 2025 (the "Bid Deadline").

A Bidder that desires to make a bid for the Acquired Assets must deliver written and electronic copies of their bid so that they are actually received prior to the Bid Deadline by: (a) counsel to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.; (b) counsel to GMES, Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich, Esq. and Brian Roy, Esq.; (c) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; and (d) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114, Attn: John Paul Lucci, Esq. (jlucci@hahnlaw.com).

As promptly as practicable after a Bidder delivers a bid, the Debtor shall determine, and shall notify the Bidder, whether the Bidder is a Qualified Bidder and whether its bid is a Qualified

Bid. The Debtor may modify, employ and announce at the Auction additional or amended procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules (i) are not materially inconsistent with the Bidding Procedures Order and (ii) are disclosed to each Qualified Bidder attending the Auction.

### Obtaining Due Diligence Access

The Debtor shall afford each Qualified Bidder reasonable due diligence information. Site access shall be provided upon reasonable request to the Debtor and at the discretion of the Debtor within its reasonable business judgment. The due diligence period will end on the Bid Deadline. The Debtor shall not be obligated to furnish any information relating to the Debtor, the Acquired Assets, and/or the sale to any person except to a Qualified Bidder. The Debtor shall give each Qualified Bidder reasonable access to an online data room containing the written due diligence materials provided to the Stalking Horse Purchaser.

The Debtor shall coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

### Due Diligence from Bidders

Each Bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors, including requests for additional information regarding such Bidder's financial wherewithal to consummate and perform obligations in connection with the sale of the Acquired Assets or such other matters as may be subject to reasonable inquiry by the Debtor. Failure by the Bidder to comply with requests for additional information may be a basis for the Debtor to determine that a bid made by the Bidder is not a Qualified Bid.

### "As Is, Where Is, With All Faults"

The sale of the Acquired Assets shall be on an "as is, where is, with all faults" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or estate, except to the extent specifically set forth in the purchase agreement between the Debtor and the Successful Bidder. All of the Debtor's right, title and interest in and to the Acquired Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests") except as otherwise set forth in the Successful Bid(s) submitted by the Successful Bidder(s), with such Interests to attach to the net proceeds of the sale of the Acquired Assets, with the same validity and priority as existed immediately prior to such sale.

Each Bidder shall be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Acquired Assets prior to making its offer, that such Bidder has relied solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that such Bidder did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets or the completeness of any information provided in connection with the bidding process, in each case except as expressly stated in the Marked Purchase Agreement (or, with respect to the Stalking Horse Purchaser, the Stalking Horse APA).

<u>The Auction</u>

If the Debtor receives two or more competing Qualified Bids for any of the Acquired Assets prior to the Bid Deadline, an auction (the "Auction") for such assets, as applicable, shall take place at 10:00 a.m. (prevailing Eastern time) on March 10, 2025 at the offices of Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, or at such other place and

time as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids. If, however, no such competing Qualified Bids are received by the Bid Deadline, then the Auction will not be held, the Stalking Horse Purchaser shall be deemed the Successful Bidder.

<u>Auction Rules:</u>

i.        Only Qualified Bidders who have submitted a Qualified Bid and their authorized representatives will be eligible to attend and participate in the Auction.  Notwithstanding the foregoing, a representative from the Office of the United States Trustee may also attend the Auction.  Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.  Qualified Bidders and their counsel wishing to participate in the Auction via audio or video conference technology may make arrangements to do so by contacting counsel for the Debtor no later than the Bid Deadline.

ii.        The Debtor may, in its sole discretion, adopt rules for the Auction at any time that the Debtor reasonably determines to be appropriate to promote a value-maximizing auction, including, without limitation, conducting one or more sub-auctions for the Acquired Assets in different subsets or lots.

iii.        At the commencement of the Auction the Debtor shall announce the Qualified Bid that it has determined represents the highest or otherwise best bid for the Acquired Assets (the "Starting Qualified Bid"), the overall consideration value ascribed to such bid (the "Bid Value") and any other distinguishing features which, in the opinion of the Debtor, makes the Starting Qualified Bid the highest or otherwise best offer for the Acquired Assets.

iv.        Each Qualified Bidder present at the Auction will be permitted to increase its Qualified Bid (such increased Qualified Bid, a "Qualified Overbid"), provided that such Qualified Overbid(s) must exceed the Bid Value of the Starting Qualified Bid or, if applicable, the highest or

otherwise best Qualified Overbid, by an incremental amount that is not less than an amount to be announced at or before the commencement of any Auction (the "Bidding Increment"). The Debtor reserves the right to determine an appropriate Bidding Increment for each subset or lot of Acquired Assets to be sold at the Auction. Notwithstanding the foregoing, the initial Bidding Increment for any Qualified Bids with respect to the Acquired Assets shall be at least fifty thousand dollars ($50,000.00), however the Debtor, in its business judgment, may select a different Bidding Increment for the Acquired Assets during the Auction.  During the course of the Auction, the Debtor will inform the participants which Qualified Overbid reflects the then-highest or otherwise best offer for the applicable Acquired Assets and the Bid Value ascribed thereto. The Debtor shall not consider any subsequent bid received at the Auction unless the Bid Value of such bid, as determined by the Debtor, exceeds the Bid Value of the Starting Qualified Bid or the then-highest Qualified Overbid by at least the applicable Bidding Increment.

v.      The Auction may be adjourned as the Debtor deems appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all Qualified Bidders that have submitted a Qualified Bid.

vi.      At the conclusion of the Auction, the Debtor shall announce the bid made pursuant to the Bidding Procedures that represents, in the Debtor's judgment, the highest or otherwise best offer for the Acquired Assets (the "Successful Bid") and the Bidder or Bidders submitting such bid (the "Successful Bidder(s)"). The Debtor may also, in its discretion, announce the next-highest or otherwise best offer or offers for any subset of the Acquired Assets (each, a "Back-Up Bid") and the party or parties submitting such bid or bids (the "Back-Up Bidder(s)"). If an Auction is held, the Debtor shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared a Successful Bid (or a Back-Up Bid) at the Auction, (ii) definitive documentation has been executed

in respect thereof, and (iii) the Court has approved the sale to a Successful Bidder (or Back-Up

Bidder). Any acceptance by the Debtor is conditioned upon approval by the Court of the Successful

Bid(s) (or Back-Up Bid(s)) and the entry of an order approving such Successful Bid(s) (or Back-

Up Bid(s)).

Other Terms

All Qualified Bids, the Auction, and the Bidding Procedures are subject to such additional

terms and conditions as may be announced by the Debtor from time to time, provided that such

additional terms and conditions are not materially inconsistent with the Bidding Procedures Order.

Irrevocability of Certain Bids

Any Successful Bid(s) shall remain irrevocable in accordance with the terms of the

Proposed Asset Purchase Agreement submitted by the Successful Bidder(s), as the same may be

modified at the Auction. Back-Up Bid(s), as modified at the Auction, shall be irrevocable until the

earliest of: (i) 45 days after entry of the Sale Order approving a Successful Bid for the same

Acquired Assets; (ii) closing of the sale of the same Acquired Assets to the Successful Bidder; and

(iii) such date as the Debtor affirms in writing that the Debtor does not intend to proceed with a

sale to the Back-Up Bidder (the "Outside Back-Up Date"). Following the entry of the Sale Order,

if a Successful Bidder fails to consummate the purchase of the Acquired Assets subject to its

Successful Bid because of a breach or failure to perform on the part of the Successful Bidder, the

applicable Back-Up Bid (if any) will be deemed to be the new Successful Bid, and the Debtor will

be authorized, but not required, to consummate the sale with the Back-Up Bidder without further

order of the Court. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to

the Debtor and the Debtor shall have the right to seek any and all other remedies and damages

from the defaulting Successful Bidder. For the avoidance of doubt, if the defaulting Successful

Bidder is the Stalking Horse Purchaser, the Stalking Horse Purchaser shall not be entitled to the Bid Protection Amount.

The Debtor will present the results of the Auction to the Court at the Sale Hearing (as defined below), at which time certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (i) the Auction was conducted and the Successful Bidder(s) were selected in accordance with these Bidding Procedures, (ii) the Auction was fair in substance and procedure, (iii) the Successful Bidder and any Back-Up Bidders are good faith buyers; and (iv) consummation of the sale contemplated by the Successful Bid(s) will provide the highest or otherwise best value for the Acquired Assets and is in the best interests of the Debtor and its creditors.

<u>Sale Hearing</u>

A hearing to consider approval of the sale of the Acquired Assets to the Successful Bidder (the "Sale Hearing") will be held before the Honorable Robert E. Littlefield, Jr., United States Bankruptcy Judge, or such other judge as may be sitting in his stead at the United States Bankruptcy Court for the Northern District of New York, 445 Broadway, Suite 330, Albany, NY 12207, the hearing may also be accessed telephonically by dialing 518-217-2288; and Conference ID: 939500229#, on March 12, 2025 at 10:30 a.m. (prevailing Eastern time), or at such other time thereafter as counsel may be heard. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

<u>Return of Deposit</u>

Except as otherwise provided in this paragraph with respect to any Successful Bid and any Back-Up Bid, the Deposits of all Qualified Bidders that submitted such a deposit under the Bidding

Procedures shall be returned upon or within three (3) business days after the date on which the Court enters an order approving the sale of the Acquired Assets to the Successful Bidder(s) or otherwise concludes the Sale Hearing without adjournment. The Deposit of the Successful Bidder(s) shall be held until the closing of the sale of the Acquired Assets and applied in accordance with the Successful Bid(s) or returned in accordance with the Successful Bidder's purchase agreement. The Deposit of the Back-Up Bidder(s) shall be returned upon or within five business (5) days after the Outside Back-Up Date.

Failure to Close

If a Successful Bidder fails to consummate the transaction in accordance with the terms of the purchase agreement executed by the Successful Bidder by the closing date contemplated in the purchase agreement agreed to by the parties for any reason (except in the case of the Stalking Horse Purchaser, in which case the termination provisions in the Stalking Horse APA shall apply to the extent applicable), the Debtor shall: (i) retain the Successful Bidder's Deposit; (ii) maintain the right to pursue all available remedies, whether legal or equitable; and (iii) be free to consummate the proposed transaction with the applicable Back-Up Bidder at the highest price bid by the Back-Up Bidder at the Auction, without the need for an additional hearing or order of the Court.

Reservation of Rights

Except as otherwise provided in the Bidding Procedures Order, the Debtor reserves the right to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or best proposal; (iv) reject any bid that the Debtor deems to be (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the

requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtor and its estate; (v) remove some of the Acquired Assets from the Auction or offer the Acquired Assets in different subsets or lots; (vi) waive terms and conditions set forth herein with respect to all Bidders; (vii) impose additional terms and conditions with respect to all Bidders; (viii) extend the deadlines set forth herein; (ix) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (x) modify the Bidding Procedures, as the Debtor may determine to be in the best interests of its estate, or to withdraw the Motion and abandon the sale process at any time with or without prejudice.

<u>Expenses</u>

Except to the extent the Stalking Horse Purchaser is entitled to a Bid Protection Amount as approved by the Court, any Bidders presenting bids shall bear their own expenses in connection with the proposed sale of the Acquired Assets, whether or not such sale is ultimately approved.

\* \* \*

# SCHEDULE 2

**To Bidding Procedures Order**

**[Notice of Auction and Sale Hearing]**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | |
| | Chapter 11 |
| SKS Bottle and Packaging, Inc., | Case No. 24-11283 |
| Debtor. | |

<u>**NOTICE OF AUCTION AND SALE HEARING**</u>

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

1.    On February __, 2025, SKS Industries LLC, the above-captioned debtor and debtor in possession ("SKS" or, the "Debtor") filed a motion (the "Motion") [Docket No. __] for entry of orders, among other things: (i) approving bidding procedures (the "Bidding Procedures") in connection with the sale of substantially all of the Debtor's assets (the "Acquired Assets"); (ii) scheduling an auction (the "Auction") and a hearing (the "Sale Hearing") to consider and approve the sale of the Acquired Assets and setting objection and bidding deadlines with respect to the sale of the Acquired Assets; (iii) approving the form and manner of notice of the Auction and the Sale Hearing; (iv) approving the terms of the Stalking Horse APA submitted by the Stalking Horse Purchaser (defined below) and the proposed Bid Protection Amount; and (v) granting related relief. The Motion additionally requests entry of an order or orders:

(i) authorizing the sale of the Acquired Assets free and clear of liens, claims, encumbrances, and interests; (ii) authorizing and approving the assumption, assignment and/or transfer of Executory Contracts and Unexpired Leases; and (iii) granting related relief.

2.    The Debtor is seeking to sell the Acquired Assets to Pipeline Packaging Corporation ("Pipeline" or the "Stalking Horse Purchaser"), or to the Successful Bidder(s) or Back-Up

Bidder(s) as determined at the Auction. Approval of the sale of the Acquired Assets may result in, among other things, the assumption, assignment and/or transfer by the Debtor of certain executory contracts and leases. If you are a party to an executory contract or lease with the Debtor, you will receive a separate notice that contains relevant dates and other information that may impact you as a party to an executory contract or lease.

3.    On February __, 2025, the United States Bankruptcy Court for the Northern District of New York (the "Court") entered an order approving the Bidding Procedures (the "Bidding Procedures Order"). Pursuant to the Bidding Procedures Order, if the Debtor receives Qualified Bids (as defined in the Bidding Procedures), an Auction for the Acquired Assets will be held on March 10, 2025, at 10:00 a.m. (prevailing Eastern time) at the offices of Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, or at such other place and time as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids. Only Qualified Bidders who have submitted a Qualified Bid in accordance with the Bidding Procedures, attached to the Bidding Procedures Order as Schedule 1, by no later than March 5, 2025 at 12:00 noon (prevailing Eastern time) (the "Bid Deadline") may participate at the Auction. Any party that wishes to take part in this process and submit a bid for the Acquired Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4.    The Sale Hearing to consider approval of the sale of the Acquired Assets free and clear of all liens, claims, encumbrances, and interests will be held before the Honorable Robert E. Littlefield, Jr., U.S. Bankruptcy Judge, or such other judge as may be sitting in his stead at the United States Bankruptcy Court for the Northern District of New York, 445 Broadway, Suite 330, Albany, New York  12207, the hearing may also be accessed telephonically by dialing (518-217-2288; and entering the Conference ID: 939500229#, on March 12, 2025 at 10:30 a.m. (prevailing

Eastern time), or at such other time thereafter as counsel may be heard.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.      Objections, if any, to the sale of the Acquired Assets, or the relief requested in the Motion (other than with respect to cure amounts and adequate assurance which are subject to a separate notice) must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Northern District of New York on or before 4:00 p.m. (prevailing Eastern time) on March 5, 2025, or such later date and time (prior to the Sale Hearing) as the Debtor may agree; and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern time) on the same day, upon (i) counsel to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.; (ii) counsel to GMES, Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich, Esq. and Brian Roy, Esq.; (iii) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; and (iv) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114, Attn: John Paul Lucci, Esq. (jlucci@hahnlaw.com).

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE COURT AND THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING AND NOTICE.**

6.      This Notice of Auction and Sale Hearing is subject to the fuller terms and conditions of the Motion, the Bidding Procedures Order, and the Bidding Procedures, which shall control in

the event of any conflict and the Debtor encourages all parties-in-interest to review such documents

in their entirety. Parties interested in receiving more information regarding the sale of the Acquired

Assets or to obtain a copy of any of the foregoing documents may make a written request to counsel

to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York,

12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.  In addition, copies of the Motion

and the Bidding Procedures Order (including the Bidding Procedures) can be found on the Court's

electronic case filing (ECF) website, http:// https://ecf.nynb.uscourts.gov, and are on file with the

Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Northern District of New

York, 445 Broadway, Suite 330, Albany, NY  12207.


Dated: February ___, 2025
  Albany, New York     WHITEMAN OSTERMAN & HANNA LLP


         By: _____
          Justin A. Heller, Esq. (Bar Roll No. 103632)
          Matthew M. Zapala, Esq. (Bar Roll No.
          519205)
          80 State Street, 11th Floor
          Albany, NY 12207
          Telephone: (518) 487-7600
          jheller@woh.com
          mzapala@woh.com

## SCHEDULE 3

**To Bidding Procedures Order**

**[Notice of Assumption, Assignment and/or Transfer]**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re

SKS Bottle and Packaging, Inc.,

Chapter 11
Case No. 24-11283

Debtor.

**NOTICE OF ASSUMPTION, ASSIGNMENT AND/OR TRANSFER**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.       On February __, 2025, the United States Bankruptcy Court for the Northern District of New York (the "Court") entered an order (the "Bidding Procedures Order"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure in the chapter 11 case (the "Chapter 11 Case") of SKS Bottle and Packaging, Inc., the above-captioned debtor and debtor in possession ("SKS" or, the "Debtor") approving, among other things, the fixing of cure amounts (the "Cure Amounts") related to the Debtor's assumption, assignment and/or transfer of certain executory contracts, unexpired leases, and other agreements listed on Exhibit A annexed hereto (each, an "Executory Contract" or "Unexpired Lease" and collectively the "Executory Contracts and Unexpired Leases") in connection with the proposed sale of substantially all of the Debtor's assets (the "Acquired Assets"). The Debtor may assume, assign, and/or transfer the Executory Contracts and Unexpired Leases to a Successful Bidder or Back-Up Bidder for the Acquired Assets under the bidding procedures (the "Bidding Procedures") approved by the Bankruptcy Court and attached to the Bidding Procedures Order as Schedule 1.

2.       The Debtor believes that any and all defaults (other than defaults arising from the filing of the Chapter 11 Case) and actual pecuniary losses under the Executory Contracts and Unexpired Leases can be cured by the payment of the respective Cure Amounts listed on Exhibit A annexed hereto.

3.       Any objections to (i) the assumption, assignment and/or transfer of an Executory Contract or Unexpired Lease, or (ii) the amount asserted on Exhibit A as the Cure Amount (each, a "Cure Amount/Assignment Objection"), must be in writing and set forth with specificity the nature of the objection and the cure amount that the objecting party believes should be paid in connection with the assumption of its Executory Contract or Unexpired Lease (the "Claimed Cure

Amount"). In addition, if the Debtor identifies additional executory contracts or unexpired leases that might be assumed by the Debtor and assigned to a Successful Bidder or Back-Up.

4.      For contracts that are not set forth in this Notice of Assumption and Assignment, the Debtor shall promptly send a supplemental notice (a "Supplemental Notice of Assumption and Assignment") to the applicable counterparties to such additional executory contracts and unexpired leases.

5.      To be considered a timely Cure Amount/Assignment Objection, the Cure Amount/Assignment Objection must be filed with the Bankruptcy Court and served upon (a) counsel to the Debtor, Whiteman Osterman & Hanna LLP, 80 State Street, 11th Floor, Albany, New York, 12207, Attn: Justin A. Heller, Esq. and Matthew M. Zapala, Esq.; (b) counsel to GMES, Harris Beach Murtha, 677 Broadway, Suite 1101, Albany, New York, 12207, Attn: Jeremy Speich, Esq. and Brian Roy, Esq.; (c) the Office of the United States Trustee for the Northern District of New York, 11A Clinton Avenue, Room 620. Albany, NY 12207, Attn: Harrison Strauss, Esq.; and (d) counsel for the Stalking Horse Purchaser, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, Ohio 44114, Attn:  John Paul Lucci, Esq. (jlucci@hahnlaw.com), by the latter of (i) 4:00 p.m. (prevailing Eastern time) on February 28, 2025; or, (ii) solely with respect to any Executory Contract or Unexpired Lease which is the subject of a Supplemental Notice of Assumption and Assignment, five (5) days after service of the relevant Supplemental Notice of Assumption and Assignment.

6.      If a Cure Amount/Assignment Objection is timely filed, the Debtor may, in its sole discretion, resolve any Cure Amount/Assignment Objection by mutual agreement with the objecting counterparty to any Executory Contract or Unexpired Lease without further order of the Court. In the event that the Debtor and any objecting party are unable to consensually resolve any Cure Amount/Assignment Objection, a hearing with respect to that objection shall be held before the Honorable Robert E. Littlefield, Jr., United States Bankruptcy Judge, United States Bankruptcy Court for the Northern District of New York, U445 Broadway, Albany, New York 12207, at 10:30 a.m. (prevailing Eastern time) on March 12, 2025.

7.      Unless a Cure Amount/Assignment Objection is timely filed and served, the assumption, assignment and/or transfer of the applicable Executory Contract or Unexpired Lease may proceed without further notice at the hearing to approve the sale of the Acquired Assets.

8.      All parties who do not file and serve a timely Cure Amount/Assignment Objection shall (i) be deemed to have waived and released any and all rights to assert against the Debtor, the Successful Bidder(s) or Back-Up Bidder(s), cure amounts different from the Cure Amounts listed on Exhibit A hereto, (ii) be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease, and (iii) be forever barred and estopped from asserting or claiming against the Debtor, the Successful Bidder(s) or the Back-Up Bidder(s), or any assignee of such Executory Contract or Unexpired Lease that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied (other than with respect to the ability of any Successful Bidder(s) or Back-Up Bidder(s) who is not the Stalking Horse Purchaser to provide adequate assurance of future performance as required by

section 365 of the Bankruptcy Code) with respect to such Executory Contract or Unexpired Lease.

9.      The Debtor, the Successful Bidder(s) or the Back-Up Bidder(s), as the case may be, and subject to the terms of the Successful Bid(s) or the Back-Up Bid(s), may determine to exclude any Executory Contract or Unexpired Lease from the list of Acquired Assets to be sold no later than the closing of the sale of the Acquired Assets, or, if the Court determines at any hearing on a Cure Amount/Assignment Objection that the applicable cure amount for such Executory Contract or Unexpired Lease is greater than the Cure Amount proposed by the Debtor, no later than five (5) business days following the date of such determination. The non-debtor party or parties to any such excluded contract or lease will be notified of such exclusion by written notice mailed within two (2) business days of such determination.

10.      If you agree with the Cure Amounts proposed by the Debtor and do not otherwise object to the Debtor's assumption, assignment and/or transfer of your Executory Contract or Unexpired Lease, you need not take any further action.

11.      Copies of the Bidding Procedures Order and other relevant documents can be found on the Court's electronic case filing (ECF) website, https://ecf.nynb.uscourts.gov, and are on file with the Clerk of the Bankruptcy Court, 445 Broadway, Albany, New York 12207.

12.      The Debtor's decision to sell, assign and/or transfer to the Successful Bidder(s) or Back-Up Bidder(s) the Executory Contracts and Unexpired Leases is subject to Court approval and to the closing of the sale of the Acquired Assets (the "Closing"). Accordingly, absent such Closing, none of the Executory Contracts or Unexpired Lease shall be deemed to be sold, assigned and/or transferred, and they shall in all respects be subject to further administration under the Bankruptcy Code. The inclusion of any document on the list of Executory Contracts and Unexpired Leases shall not constitute or be deemed to be a determination or admission that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

Dated: February ___, 2025
       Albany, New York                      WHITEMAN OSTERMAN & HANNA LLP


                                             By: _____
                                                 Justin A. Heller, Esq. (Bar Roll No. 103632)
                                                 Matthew M. Zapala, Esq. (Bar Roll No. 519205)
                                                 80 State Street, 11th Floor
                                                 Albany, NY 12207
                                                 Telephone: (518) 487-7600
                                                 jheller@woh.com
                                                 mzapala@woh.com

## **Exhibit C**

Form of Sale Order

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | |
| | Chapter 11 |
| SKS Bottle and Packaging, Inc., | Case No. 24-11283 |
| Debtor. | |

**ORDER APPROVING SALE OF SKS BOTTLE AND PACKAGING, INC.'S ASSETS
AND, IF ANY, THE ASSUMPTION & ASSIGNMENT OF EXECUTORY
CONTRACTS & UNEXPIRED LEASES UNDER 11 U.S.C. §§ 363 & 365**

Upon consideration of the Motion filed by SKS Bottle and Packaging, Inc., the above-captioned debtor and debtor in possession ("SKS" or, the "Debtor"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), as supplemented by Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (this "Bidding Procedures Order"): (i) approving bidding procedures in connection with the sale of substantially all of the Debtor's assets; (ii) scheduling an auction and a hearing to consider and approve the sale; (iii) approving the form and manner of notice thereof; (iv) approving the terms of the Stalking Horse APA and the proposed Bid Protection Amount; and (v) granting related relief (ECF No. __) (the "Motion"); the Court's Order entered on February __, 2025 (ECF No. ___) (the "Bidding

1

Procedures Order", and the bidding procedures approved by such Bidding Procedures Order, the

"Bidding Procedures"), the sale transaction represented by the Stalking Horse APA (the "APA") by

and between SKS and Pipeline Packaging Corporation (the "Stalking Horse Purchaser"), and upon

the record of the sale hearing held on March 12, 2025 and the Bidding Procedures, all of which

are incorporated herein by reference;

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.    Jurisdiction & Venue: This Court has jurisdiction to consider the Motion

and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1134. Approval of SKS's entry

into the Stalking Horse APA, and the transaction contemplated thereby (the "Sale Transaction"),

is a core proceeding under 28 U.S.C. §§ 157(b)(2). Venue of these cases in this District is proper

pursuant to 28 U.S.C. §§ 1408 and 1409(a).

B.    Predicates for Relief. The legal predicates for the relief granted herein are

sections 363(b), 363(f), 363(m), 365, 541(a), 1107 and 1108 of the Bankruptcy Code and rules

2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure.

C.    Notice: Proper, timely, and sufficient notice of the Motion, Bidding

Procedures, Sale Transaction, proposed assumption and assignment of the Assumed Executory

Contracts (as defined in the APA) through the Notice of Assumption and Assignment (the "Cure

Notices"), and Sale Hearing has been provided under Bankruptcy Code sections 102(1), 105(a), and

363, 365, Bankruptcy Rules 2002, 4001, and 6004, the Local Rules and Bidding Procedures Order.

No further notice is required.

D.    Opportunity to Object. A reasonable opportunity to object or be heard with

respect to the Motion and the relief requested therein has been afforded to all interested persons

and entities.

E.     Marketing & Sale Process: The Debtor actively sought out prospective purchasers both pre- and post-petition and offered all parties in interest and prospective purchasers a reasonable and fair opportunity to bid for the Acquired Assets (as defined in the APA), and conducted the marketing and sale process in good faith. The Bidding Procedures were fair to all parties and all prospective bidders.

F.     Sale Transaction Agreement: In accordance with the Bidding Procedures, the Purchaser was determined to be a Qualified Bidder (as defined in the Bidding Procedures), and the APA was a Qualified Bid (as defined in the Bidding Procedures). A true and correct copy of the APA is attached hereto as Exhibit A.

G.     Business Judgment: In accordance with the Bidding Procedures, SKS determined in a valid and sound exercise of its business judgment consistent with its fiduciary duty, that the highest or otherwise best Qualified Bid for the Acquired Assets was that of the Purchaser. SKS's decision to enter into and perform under the APA is in the best interests of SKS, its estates, their creditors, and all other parties in interest.

H.     Sale Free and Clear: Except with respect to any Assumed Obligations and Permitted Liens (as defined in the APA), a sale of the Acquired Assets other than one free and clear of all interests, to the fullest extent permitted by section 363(f) of the Bankruptcy Code (the "Encumbrances"), and without the protections of this Sale Order would hinder SKS's ability to obtain the consideration provided for in the APA and, thus, would impact materially and adversely the value that SKS's estate would be able to obtain for the sale of such Acquired Assets.

I.     Good Faith/Arm's-length Sale: The consideration to be paid by the Purchaser under the APA was negotiated at arm's-length and constitutes reasonably equivalent

value and fair consideration for the Acquired Assets. The Sale Transaction was negotiated and entered into in good faith as that term is used in Bankruptcy Code sections 363(m) and 364(e).

J.  Legal, Valid Transfer. The Acquired Assets constitute property of SKS's estate and title thereto is presently vested in SKS's estate within the meaning of Bankruptcy Code section 541(a). The sale of the Acquired Assets to the Purchaser will be, as of the Closing Date or such later date as such Acquired Assets are transferred under the APA, a legal, valid, and effective transfer of such Acquired Assets, and each transfer and assignment vests or will vest the Purchaser with all right, title, and interest of SKS to the Acquired Assets free and clear of all Encumbrances (other than with respect to any Assumed Obligations and the Permitted Liens).

K.  Assumption and Assignment of the Assumed Executory Contracts: The assumption and assignment of the executory contracts and unexpired leases of SKS that may be assumed and assigned in connection with the Sale Transaction (as such contracts and leases may be amended, supplemented, or otherwise modified prior to assumption and assignment without further order of this Court with the consent of SKS, the Contract Counterparty, and the Purchaser) (the "Assumed Executory Contracts") is integral to the APA. SKS has met all requirements of Bankruptcy Code section 365(b) for each of the Assumed Executory Contracts. Purchaser has demonstrated adequate assurance of its future performance under the relevant Assumed Executory Contracts pursuant to Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

L.  No Successor Liability: The Purchaser is not and shall not be deemed a successor to SKS as a result of the consummation of the Sale Transaction.

M.  No Third-Party Beneficiaries. Nothing in the APA creates any third-party beneficiary rights in any entity not a party to the APA.

4

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

**A.     Motion Granted, Objections Overruled**

1.      The relief requested in the Motion is granted as set forth herein. Any remaining objections or reservations of rights regarding the Motion or the relief requested therein that have not been withdrawn, waived, or settled are overruled with prejudice and denied. All parties and entities that failed to timely object thereto are deemed to consent to the relief sought therein.

**B.     The APA Is Approved and Authorized**

2.      The APA, and the Sale Transaction, are hereby approved.

3.      Subject to the provisions of this Sale Order, SKS and the Purchaser are hereby authorized, to (a) consummate the Sale Transaction in accordance with the APA, (b) assume and assign to Purchaser all Assumed Executory Contracts, if any, as and when provided in the APA, (c) execute such documents and perform such acts as are necessary or desirable to carry out the Sale Transaction and effectuate the APA, and (d) perform all other obligations under the APA.

4.      As part of consummating the Sale Transaction, the Debtor is authorized to pay the GMES Administrative Claim at Closing.  Pursuant to the Final Order authorizing the Debtor's use of cash collateral, GMES was granted an administrative expense claim for unpaid post-petition rent during a portion of November 2024 through January 2025 in the amount of $244,569.94, and a post-petition lien on all of the Debtor's assets for the portion of such amount representing the January 2025 rent ($100,507.94).  The GMES Administrative Claim also includes rent for February 2025 and March 2025 (or so much thereof as is allocable to the period during the Debtor's continued occupancy), at the rate of $100,507.94 per month.

5

**C.    Sale and Transfer Free and Clear of Encumbrances**

5.    The conditions of section 363(f) have been satisfied in full, including, specifically, that known creditors having or asserting Encumbrances on the Acquired Assets have consented to the Sale or can be compelled to accept a money satisfaction of such interest, or that any such asserted Encumbrances are less than the value of all liens on the Acquired Assets or are in bona fide dispute, in each case pursuant to section 363 of the Bankruptcy Code.

6.    Upon Closing, all of SKS's legal, equitable and beneficial right, title, and interest in and to, and possession of, the Acquired Assets shall be immediately vested in the Purchaser free and clear of all Encumbrances (other than with respect to any Assumed Obligations, Permitted Liens, or as otherwise provided herein) to the fullest extent permissible pursuant to section 363(f) of the Bankruptcy Code. Such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest Purchaser with good and marketable title to the Acquired Assets.

7.    As of the Closing Date, to the fullest extent permitted by law, the Purchaser is authorized to operate under any license, permit, insurance policy, registration, and governmental authorization or approval of SKS constituting Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, authorized to be transferred to the Purchaser as of the Closing Date as provided by the APA to the fullest extent permitted by law. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Acquired Assets sold, transferred, assigned, or conveyed to the Purchaser on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Sale.

8.     The holders of claims, if any, related solely to any Assumed Obligations shall seek payment directly from the Purchaser on account of such Assumed Obligations; provided, however, that the Purchaser reserves any and all rights, defenses, or objections with regard to such Assumed Obligations, including the Purchaser's rights hereunder and under the APA. Anything herein to the contrary notwithstanding, Purchaser's agreement hereunder (whether listed in a schedule or in a separate document) to pay a portion of any particular debts or liabilities of SKS owing to any third party or Purchaser's actual payment of any such debts or liabilities shall not render Purchaser liable to such third party for other debts or liabilities that may owing to them by Debtor or liable to other parties who did not receive any such payments from Purchaser.

9.     All parties with or asserting Encumbrances against the Acquired Assets (a) have or are deemed to have consented to the Motion pursuant to section 363(f)(2) of the Bankruptcy Code, (b) can be compelled to accept a monetary satisfaction of their Encumbrances within the meaning of section 363(f)(5) of the Bankruptcy Code and, in each case, are estopped and barred from taking any action against the Purchaser, its affiliates or any agent of the foregoing to recover any claim that such person or entity has solely against the Debtor or any of its affiliates, (c) have or have asserted Encumbrances against the Acquired Assets of a value lesser than the price at which such Acquired Assets are to be sold pursuant to section 363(f)(3) of the Bankruptcy Code, or (d) have or have asserted Encumbrances against the Acquired Assets that are in bona fide dispute within the meaning of section 363(f)(4) of the Bankruptcy Code. Therefore, the transfer of the Acquired Assets to the Purchaser under the APA as of the Closing shall be a legal, valid, and effective transfer of the Acquired Assets, and, except as expressly permitted under the express terms of the APA, shall vest the Purchaser with all right, title, and interest of SKS to the Acquired Assets free and clear of all Encumbrances (other than any Assumed Obligations or Permitted Liens). For the further avoidance

of doubt, and without limiting the effect of any of the foregoing, the transfer, assumption and assignment, of any of the Assumed Executory Contracts shall be free and clear of all Encumbrances, other than the contractual commitments being assumed by the Purchaser following assignment thereof. If any person or entity that has filed a mechanic's and/or materialmen's lien, deed of trust, mortgage, judgment lien, financing statement, or other document or agreement evidencing a lien, claim, encumbrance, or interest in, on, or against the Acquired Assets shall not have delivered to the Purchaser at or prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances that the person or entity has against any of the Acquired Assets, either the Debtor or the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity after the occurrence of the Closing Date. The Debtor reserves all rights with respect to the priority, amount and characterization of any claims against the Debtor's estate, and with respect to the secured status and amount of any purported liens asserted by any person or entity.

10.     Unless related to an Assumed Obligation pursuant to sections 105(a) and 363 of the Bankruptcy Code, effective as of the Closing Date, all persons are hereby forever barred and estopped from taking any action against the Purchaser or the Purchaser's affiliates (as they exist immediately prior to the Closing) to recover or enforce any lien, claim, interest, or encumbrance that such person has against the Acquired Assets as of the Closing Date.

**D.     Order Binding**

11.     This Sale Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental

departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Acquired Assets. The Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the sale free and clear of all Encumbrances (other than with respect to any Assumed Obligations or Permitted Liens) against the Purchaser and the Acquired Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

12.    All government agencies and all other persons are hereby authorized to accept any documents and instruments necessary or appropriate to consummate the Sale Transaction and this Sale Order, and are authorized to remove all recorded liens against the Acquired Assets from their records other than with respect to any Assumed Obligations or Permitted Liens.

13.    This Sale Order and the terms and provisions of the APA shall be binding on all of SKS's creditors (whether known or unknown), SKS, the Purchaser, and their respective affiliates, successors, and assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of SKS under chapter 7 or chapter 11 of the Bankruptcy Code, and any affected third parties including, but not limited to, all persons asserting an interest in or to any of the Acquired Assets. The provisions of this Sale Order and the APA, and any actions taken pursuant hereto or thereto shall survive the entry of any order which may be entered confirming or consummating any plan of SKS or converting SKS's cases to chapter 7.

14. To the extent applicable, the counterparties to the Assumed Contracts, if any, are forever bound by the applicable Cure Amounts and, upon payment of such Cure Amounts as provided for herein, are hereby enjoined from taking any action against the Purchaser, the Purchaser's property (including, without limitation, the Acquired Assets), and the Purchaser's successors, assigns, affiliates and representatives with respect to any claim for cure under the applicable Assumed Executory Contracts.

**E.    Good Faith**

16. SKS and Purchaser entered into the Sale Transaction in good faith. Purchaser is entitled to all of the benefits and protections of Bankruptcy Code sections 363(m) and 364(e), and the Sale Transaction is not subject to avoidance under Bankruptcy Code section 363(n). The reversal or modification on appeal of this Sale Order shall not affect the validity of the Sale Transaction, unless such authorization is duly stayed pending such appeal.

**F.    No Successor or Transferee Liability**

17. Except as expressly provided in the APA with respect to any Assumed Liabilities, Purchaser shall (a) have no liability whatsoever with respect to the Debtor's (or their predecessors or affiliates) businesses or operations or any of the Debtor's (or their predecessors or affiliates) obligations, and (b) not be deemed to be a successor to SKS as a result of any action taken in connection with the APA, the consummation of the Sale Transaction, or the transfer of the Acquired Assets.

**G.    Assumption and Assignment of Purchased Contracts**

18. To the extent applicable, SKS is authorized to assume and assign to the Purchaser each of the Assumed Executory Contracts, if any, pursuant to the terms of the APA, free and clear of all Encumbrances.

19.    To the extent applicable, the payment of the Cure Amounts by the Purchaser under the APA and this Sale Order (or such other amount agreed to by any party to a Assumed Executory Contract and SKS with the prior written consent of the Purchaser) (a) cures all monetary defaults existing thereunder as of the assignment of the Assumed Executory Contracts to the Purchaser in accordance with the terms of the APA; (b) compensates the applicable Contract Counterparties for any actual pecuniary loss resulting from such default; and (c) together with the assumption of the Assumed Executory Contracts by SKS and the assignment of the Assumed Executory Contracts to the Purchaser constitutes adequate assurance of future performance thereof.

20.    To the extent that any Contract Counterparty to a Assumed Executory Contract did not timely file an adequate assurance objection by the Contract Objection deadline, such Contract Counterparty is deemed to have consented to the assumption and assignment of the Assumed Executory Contract pursuant to the terms of this Sale Order, and all such objections that were timely filed and not subsequently withdrawn are overruled.

21.    To the extent that any Contract Counterparty to a Assumed Executory Contract did not timely file a Contract Objection by the Contract Objection Deadline, such Contract Counterparty is deemed to have consented to the assumption and assignment of the Assumed Executory Contract pursuant to the terms of this Sale Order. All objections that were timely filed and not withdrawn are overruled.

22.    Any provision in any Assumed Executory Contract that prohibits or conditions the assignment of such Assumed Executory Contract or allows the Contract Counterparty to such Assumed Executory Contract to impose any penalty, fee, rent increase, profit sharing arrangement or other condition on renewal or extension, or to modify any term or condition

upon the assignment of such Assumed Executory Contract, constitutes an unenforceable anti-assignment provision that is void and of no force and effect in connection with the Sale Transaction and the assumption and assignment of the Assumed Executory Contract in connection therewith.

23. Upon the assignment of the Assumed Executory Contracts, if any, to the Purchaser in accordance with the terms of the APA, the Purchaser shall be deemed to be substituted for SKS as a party to the applicable Assumed Executory Contracts, and the Debtor and its estate shall be released, pursuant to Bankruptcy Code section 365(k), from any liability for any breach of the Assumed Executory Contract occurring after such assignment. There shall be no assignment fees, increases, or any other fees charged to the Purchaser or the Debtor as a result of the assumption and assignment of the Assumed Executory Contracts.

24. Each Contract Counterparty to an Assumed Executory Contract is forever barred, estopped, and permanently enjoined from asserting against the Debtor or the Purchaser or their respective property (including, without limitation, the Acquired Assets), successors, assigns, affiliates and representatives, in connection with this transaction (a) any penalty, fee or condition to assignment existing, arising or accruing as of the Closing Date (as such term is defined in the APA); (b) any claimed default or breach that is inconsistent with the Cure Amounts that have been determined with respect to such Assumed Executory Contract; and (c) any contention that the Assumed Executory Contract has not been validly assumed and assigned.

25. Other than the Assumed Executory Contract, if any, the Purchaser shall assume none of SKS's other contracts or leases, and shall have no liability whatsoever thereunder.

**H. Other Provisions**

26. <u>No Bulk Sales</u>. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.

27.    <u>Modifications</u>. The APA and any related agreements or documents may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court; <u>provided</u> that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate.

28.    <u>Automatic Stay</u>.    Cause exists and the automatic stay pursuant to Bankruptcy Code section 362 is thus hereby lifted with respect to SKS to the extent necessary to allow the Purchaser to take any and all actions and deliver notices permitted or required under the APA without further order of this Court.

29.    <u>No Stay of Order</u>. Time is of the essence in consummating the Sale Transaction. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, this Sale Order shall be effective and enforceable immediately upon entry, and its provisions shall be self-executing; this Court thus expressly finds that there is no just reason for delay in the implementation of this Order and expressly waives any stay thereon.

30.    <u>Retention of Jurisdiction</u>. This Court shall retain jurisdiction to interpret, implement, and enforce this Sale Order, the Bidding Procedures, the APA, and all documents executed in connection with the Sale Transaction.

###

## **Exhibit D**

Form of Assumption Agreement

[To be provided]

## **Exhibit E**

Form of Bill of Sale

[To be provided]

**Exhibit F**

Form of Assignment of Trademarks

[To be provided]

## **Exhibit G**

Form of Assignment of Domain Names

[To be provided]